INDUSTRIAL INSTITUTE AND COLLEGE CASE.

STATE OF MISSISSIPPI, EX REL., J. W. BARRON, DISTRICT AT-
TORNEY *v.* WILLIAM Q. COLE, AUDITOR.

CONSTITUTIONAL LAW. *Constitution* 1890, sec. 212. *Not self-executing.*
Sec. 212, Constitution 1890, fixing the rate of interest to be paid by
the state upon trust funds held by it for educational purposes and
dates for distribution of same, is not self-executing and the courts
will not compel the auditor to issue a warrant in payment of the
state's obligations thereunder, in the absence of a legislative ap-
propriation for that purpose.

FROM the circuit court of, first district, Hinds County.

HON. ROBERT POWELL, Judge.

The State of Mississippi, *ex rel.*, Barron, district attorney,
appellant, was plaintiff in the court below; Cole, auditor of
public accounts, appellee, was defendant there. The section
of the constitution involved is as follows :

"Section 212. The rate of interest on the funds known as
the Chicasaw School Fund and other trust funds for educa-
tional purposes for which the state is responsible, shall be
fixed, and remain as long as said funds are held by·the state,
at six per centum per annum from and after the close of the
fiscal year A. D. 1891, and the distribution of said interest
shall be made semi-annually on the first day of May and No-
vember of each year."

The Industrial Institute and College for Girls, at Columbus,
was incorporated and established by the act of the legislature
approved March 12, 1884. By the act of congress, 28 U. S.
Statutes at large, p. 815, approved March 2, 1895, it was pro-
vided that the governor of Mississippi should be authorized to
select lands of the United States situate in said state amount-
ing to one township in quantity, and that patents should issue
therefor to the state, provided the proceeds of said lands, when

sold or leased, should forever remain a fund for the use of the Industrial Institute and College for Girls. The legislature of the state passed an act in 1898 (acts 1898, c. 45) accepting the grant, and authorized the sale or lease thereof, or a sale of the timber thereon. Acting under the authority of this act, the board of trustee of said institution proceeded to procure patents to the land from the United States, and sold the timber from the lands, and the proceeds of the sale, to the amount of $156,495.05, was paid into the state treasury and credited to the Industrial Institute and College for Girls as required by law, the payments being made on the 13th and 17th days of August, 1901. This action was begun by a petition for a writ of mandamus, filed in the name of the state by the district attorney of the district where the school is located, to compel William Q. Cole, auditor, the appellee, to issue a warrant to pay the interest on the money to the said Industrial Institute and College for Girls.

The court below sustained a demurrer to the petition and dismissed the suit. The plaintiff appealed to the supreme court.

*Mayes & Harris,* for appellant.

In order that the college shall be entitled to receive the interest on this fund in the state treasury it is not necessary that the legislature pass any further act of appropriation in the premises; sec. 212 of the constitution is itself an appropriation self-operative and altogether sufficient; and if it were not so, sec. 3 of the acts of 1898 (Laws 1898, chapter 45) accepting the donation of congress is itself a sufficient act of appropriation, perpetual in its nature.

The grant of lands made by the act of congress was not a donation to the state for its own use; but it was in its legal effect a donation direct to the college.

The institution was then in existence; its purpose and scheme of management were defined by the laws of Mississippi.

Section 212 of the constitution of this state was also in force

at the time of the grant.   It must be conclusively presumed that when congress of the United States made the land grant in question in the way in which it was made, congress had in view the subsisting condition of the law in Mississippi, and the end, purpose and management of the college, including its relation to the state.

When the state accepted the donation in behalf of the college, it took the lands as trustee for the use of the college; while no citizen could interfere, but only the United States, in case its trusteeship is not observed in good faith, yet, nevertheless, the obligation of the state remained.   *Morton* v. *Grenada Academy,* 8 Smed. & M., 773; *Jones* v. *Madison County*, 72 Miss., 777; *United States* v. *Louisiana*, 127 U. S., 182.

The provision of sec. 212 of the constitution is express that " the distribution of said interest shall be made semi-annually on the first of May and November of each year." This is not merely a constitutional declaration fixing the time at which the distribution shall be made; but also it is a clear and positive declaration that the distribution shall be made.   The machinery for its making contemplated by the constitution is manifestly the ordinary machinery for the distribution of said funds provided for by the general laws of the state, and it is only necessary in order that the institution shall receive this interest, or that any other interest payable on account of these educational funds shall be paid, to apply to the auditor in the usual manner.

We repeat, this constitutional provision is self-executing. It declares, not that the interest shall be appropriated by the legislature, nor that provisions shall be made for its payment by law, but that the payment shall be made at the time when such constitutional enactment was adopted, the method of making payments of moneys out of the state treasury was settled by long usage, and there was full, adequate and general legislation on the subject; and it was not necessary for the constitutional convention to undertake to prescribe here details of

means by which the money was to be turned over. The provision manifestly contemplates that it should be made in the usual way, so far as the mere bureau work of its making is concerned.

Clearly, the constitutional convention did not regard the mere processes by which the payment should be made as at all material, and it was not necessary, nor was it intended by them by constitutional legislation to enact permanently and unalterably the mere formula by which the payment should be made.

That the provision of the constitution was directed to the doing of the thing, *i. e.*, the payment of the money, as distinguished from an injunction upon the legislature to pass a law of appropriation, is clear. Such constitutional injunction is by no means a novelty. It has long been recognized in our constitutional law.

This particular provision is manifestly self-executing. *Davis* v. *Burke*, 179 U. S., 399; *Willis* v. *St. Paul, etc. Co.*, 16 L. R. A., 281; *Rice* v. *Howell*, 69 Pac. Rep., 67 (Cal.).

It was contended in the court below that sec. 212 could not avail as an appropriation of itself because it made no provision for the ways and means of payment; that the auditor could not issue a warrant under it because §§ 230–235 of the code of 1892 provided that the auditor shall not draw warrants for appropriations of money for any purpose except in those cases specifically provided for by law, and also provided that his warrants, when drawn, should cite in or upon each warrant "the section of the code, or the section and page of any other book of statutes, or the date of approval and title of the act of the legislature which authorized the issuance thereof." It was said that there must be a law making specific provision and that law must be cited on the face of the warrant, else no warrant can lawfully issue. To this we answer that the constitutional provision is itself a law, and the highest law of the

state. It is just as much a law of the state as a legislative enactment is a law. All that the auditor had to do to fulfill the requirements of § 230 and § 235 is to cite the provision of sec. 212 of the constitution and the act of 1898.

To this we reply, further, that, if these acts of the legislature did tend to deprive the auditor of the power to issue a warrant to pay this interest, the payment of which is required by the constitution, and was so required by the constitution before these statutes were passed, then the acts of themselves, *quoad hoc*, were unconstitutional and void. It cannot possibly be the case that a constitutional requirement that a payment shall be made, which necessarily intends that it shall be made through the auditor's office in the usual way, can be overturned by legislation of the sort cited in this connection. But, as shown above, these statutes do not conflict with the constitutional requirement and they could be fulfilled by citing the constitutional section and the act of 1896.

It was also contended in the court below that the interpretation contended for by us could not be placed on sec. 212 of the constitution because such interpretation would change the policy of the state affecting appropriations, as evidenced by other provisions in the constitution. Those other provisions were secs. 63 and 64, which provided that:

"No appropriation bill shall be passed by the legislature which does not fix definitely the maximum sum thereby authorized to be drawn from the treasury;" and

"No bill passed after the adoption of this constitution to make any appropriations of money out of the state treasury shall continue in force more than six months after the meeting of the legislature at its next regular session, nor shall such bill be passed except by the votes of a majority of all the members elected to each house of the legislature."

To the foregoing proposition, there are several answers:

First. The two provisions relied upon are so manifestly directed against legislative action and legislative action only,

that it is unnecessary to argue the question. They are so restricted by their very terms. The policy which is evidenced by them must be taken just as it is indicated, and it is a prohibition against the creation by any one legislature of a charge upon the revenues of the state which shall be·indefinitely continuing in its character; and the establishment of a rule that on every proposition to draw money out of the state treasury, the merit of the question and the desert of the measure shall come before each legislature, and be debated and passed *ab initio*. The policy indicated is not a disfavor of standing appropriations in themselves, but it- is a prohibition of standing appropriations made by legislative action. But our contention is, that this appropriation is made directly by the people in their constitutional convention assembled, and not indirectly through the legislature as their general legislative agents. Obviously, it seems to us, the very reason why sec. 212 was inserted into the constitution, whereby a perpetual appropriation was made of the interest on these educational funds, was to obviate the necessity for action on the part of ·each successive legislature, and to place that great and vital interest of the state beyond all fluctuations and impulsive changes incident to institutions which would require to be upheld by affirmative legislative action repeated every four years.

It is matter of common knowledge that for many years past, and especially in the deliberations and resolutions of the constitutional convention, the encouragement and. furtherance of the educational interests of this state have been matters extremely favored, and it is easy to see why the constitutional convention, when adopting secs. 63 and 64, should at the same time have adopted sec. 212 for the very purpose of preventing the peril to educational interests which would otherwise result from the operation of secs. 63 and 64.

Second. It seems a curious and wholly untenable line of argument that the clear and explicit declaration of one provision in the constitution should be practically wiped out by

invoking a policy inferred from other provisions of the same constitution. The constitution was adopted *uno flatu;* it was enacted as a whole. Each provision in it must be given, so far as possible, full and effectual operation.

Looking at the same as a whole, and taking secs. 63, 64 and 212 in connection with each other, the scheme was very simple. Sections 63 and 64 forbade standing appropriations by the legislature, but sec. 212 itself made a standing appropriation in favor of a special interest, or a group of special interests rather. It is clearly a case of the common maxim *generalia specialibus non derogant.*

There is another very obvious reason why secs. 63 and 64 do not control sec. 212.

As a matter of fact, they deal with an essentially different subject-matter. Sections 63 and 64 were intended by the convention to withdraw from the legislature the power to make standing appropriations out of the state treasury, where such appropriations operated as contributions or donations by the state out· of its revenues; where the state itself, by such appropriations acted as the efficient contributor or donor to the interest or cause, whatever its nature might be, to meet the expense of which such appropriation should be made; in other words, where the legislature undertakes to disburse the state's own revenues for such objects, including, of course, the ordinary governmental expenditures, as might recommend themselves to the favor of the legislature. But sec. 212 deals with the obligation of the state to pay the interest on debts which the state shall owe in its attitude of trustee-debtor.

This latter class of disbursements is such as no legislature can properly, or with credit to the state, or even honestly withhold; and it is with these, we think, that the provision of sec. 212 of the constitution undertakes to deal; and the constitutional convention in enacting that provision obviously intended to put these appropriations on a final and stable basis, to withdraw from the legislature the power of withholding

payment thereof, and to require the fiscal officers of the state
to make such payment in due and regular course, whether ap-
propriation bills have been passed by the legislature for that
purpose or not.

The two subjects-matter, therefore, dealt with by these three
paragraphs are essentially and fundamentally different; and
the case at bar falls within the policy of the latter class pro-
vided for by sec. 212.

It was further contended below that sec. 212 could not be
treated as a self-executing appropriation, because, while that
section fixed the rate of interest to be paid, it did not and
could not fix the amount of principal upon which the interest
should be paid, and the fixation of such amount of principal
must be made, and could only be made by the legislature.

It is said that while it is true that the petition states, and
and the demurrer admits, that the sum of $156,495.00 was
realized from the sale of the donated lands and had been paid
into the state treasury, that the state legislature had never
recognized such amount as the correct amount, or agreed to
pay interest on the same; and it might be that the title to some
of these lands would fail, and the state be called upon to refund.

To this we answer that it was not necessary for the legis-
lature to pass upon the amount received by the auditor.   That
was the function of the auditor himself.   He is a constitutional
officer, and his duties have been for very many years fixed by
general law; and under the rule laid down in *French* v. *State*,
52 Miss., 759, his authority is clearly established.

The petition for mandamus alleged the exact sum which was
paid into the treasury and the demurrer admits the same; and
the obligation of the state to pay immediately attached.   The
position that before the interest is payable, and before the
auditor may draw his warrant, the legislature must take action,
is directly in the teeth of the express provision of sec. 212
itself.   This is clear.

Suppose, for instance, this money had been paid into the

treasury immediately after the adjournment of the legislature for the year 1900. The constitution expressly declares that the interest shall be paid "semi-annually, on the first of May and November of each year."

In the face of this declaration, how can it be argued that the constitution contemplates that the payment of the interest is to be reserved and made contingent upon a recognition by the legislature of the amount of a principal on which the interest is to be paid, when the very constitution itself declares that the legislature shall meet in regular or special session only once in two years?

Under the supposed case put above, three payments of interest would have to be made before any legislature could meet, and in the case which actually occurred, and is now before the court, one payment was due and ought to have been made before the time arrived for a meeting of the legislature.

The position assumed below was sought to be reinforced by the proposition that it was necessary for the legislature to recognize the amount of the principal on which the interest should be paid, because "it might be that the title of some of these lands would fail and the state be called upon to refund." That is a merely imaginary difficulty. It is purely speculative and fanciful. The answer to it is written on the very face of sec. 212 itself, because the section provides in terms that the interest "shall be fixed and remain as long as said funds are held by the state," and if the state has to refund any of such funds because of the failure of title to the lands, the interest on the amount so refunded immediately stops *ex vi termini*.

And it is further to be said that, if the state shall be called upon to refund any of these moneys on account of the failure of title to the lands, it will pay no interest thereon to the parties to whom the moneys are refunded, and there is no reason why it should not pay interest to the school fund, for whose account these moneys have been held in the state treas-

ury, the state in the meantime and during such holding having actually had the benefit of the same.

Take a supposed case: These moneys were paid in in 1898. After the lapse of four years, the state is called upon to refund the sum of $1,000 on account of the failure of title to a small portion of the land sold; the state has had the benefit of this $1,000 during the four years; it has had that benefit just as much during that four years as if the title to the land were good. What reason is there why the state should not pay the interest on the $1,000 during the time when it had the money? None whatever. The trouble imagined by counsel below in this connection is, as we have already pointed out, specifically provided for in sec. 212 itself.

We now come to another proposition, which is this: If the language of sec. 212 were not in itself sufficient to constitute an appropriation, the language of chapter 45 of the act of 1898 would be.

That statute expressly declares that the funds, when credited to the college in the treasury, "shall there forever remain a fund for the use of said college, and interest thereon shall be paid to said college under and in accordance with sec. 212 of the state constitution."

It would seem clear that it cannot now be necessary to pass an act of the legislature declaring that the money shall be paid where there is already a constitutional provision and an act of the legislature in force, not only declaring that it shall be paid, but fixing the very days on which that payment shall be made "in each year."

There is no magic in the words or phrase, "hereby appropriated," or in the phrase, "to be paid out of moneys in the treasury not otherwise appropriated." That is all matter of mere form. A declaration by the legislature declaring that money shall be paid carries with it all these necessary intendments.

Nor by this view can it be said that the act of 1898 is

brought in conflict with sec. 64 of the constitution. It does not conflict with such section for the very simple reason that it is an act which carries out and effectuates the explicit direction of sec. 212 of the constitution. It cannot be said that an act which gives effect and fulfills the direction of one section of the constitution is in conflict with another and different section of the constitution, for the very reason that it has given effect to the former section. The constitution is a whole, and it must be treated as such. It deals with many and various interests, and it would be a fundamental error of construction and application to wipe out the special interests dealt with by the generality of general provisions.

There is another view, which is this: "That without reference to sec. 212 of the constitution, sec. 158 would not come within the intendment by sec. 64 for the reason that the act of 1898 is a bill enacted by the legislature, not in the exercise of the ordinary sovereignty of the state and making appropriations for the discharge of the state's sovereign functions out of its ordinary revenue as it is an ordinary appropriations bill, but this act is in recognition of and in discharge of the state's obligation as a debtor and that obligation incurred by a contract between the state, on the one hand, and the United States on the other. It is the same category as appears in the case of *Stearns* v. *Minn.*, 179 U. S., 223, 245.

*Monroe McClurg*, attorney-general, for appellee.

The petition fails to disclose such public interest as that which demands the use of the extraordinary writ of mandamus. There is an utter absence of any showing of a pressing need for the interest, or of any other reason why the public interest will be materially affected by its remaining in the state treasury. The mere technical right, if such right should be conceded, to have it paid into the treasury of the institution is not a sufficient cause. Should this money be ordered into their treasury the trustees would be powerless to use it

in the absence of legislative direction. The well-known policy of the state fixed in its statutes for a long number of years, its universal practice, to ascertain the amount of interest on trust funds for which it is reponsible, then to make an appropriation therefor and distribution thereof through legislative action, cannot be disregarded by the courts—it is binding upon judicial judgment and discretion and must be followed. The interest on the funded debt of the state is embraced with provision for the common schools in the general appropriation bill passed by each legislature by requirement of sec. 67 of the constitution. All other appropriations contemplating the payment of all other interest due by the state is embraced in separate bills prescribing the conditions on which it may be drawn and for what purposes paid. This is the fixed policy of the state; it conforms to sec. 69 of the constitution, emphatically so with reference to the Industrial Institute and College since its organization.

Section 103 of the constitution restricts the duties and powers of the auditor to those which the legislature shall prescribe, and no duty can result from the holding of the auditor's office which the legislature has not imposed. The salaries of all state officers is fixed by law to a cent, as is the time for their payment, yet the auditor of Mississippi cannot draw a warrant to pay them unless a specific appropriation for that particular purpose is made. This, not only because his duties are prescribed by statute and not the constitution, but for the further reason that all appropriations, for all purposes, most " definitely fix the maximum sum thereby authorized to be drawn from the treasury," and because no appropriation may " continue in force longer than six months after the meeting of the legislature at its next regular session," according to the claim set up in the petition, there is a continuing appropriation of the interest made by sec. 212. There is now no such thing as a continuing appropriation longer than as above stated. Constitution secs. 63 and 64. The trust confided to the state by the act

of congress mentioned in the bill is to be executed as the trustee
(the state) wills, and not otherwise.    There are no conditions,
no directions but to hold it and fix the interest from time to
time as it sees proper and direct its appropriations and dis-
bursement.

A decisive criticism by which to determine whether a pro-
vision of the constitution is self-executing is, whether the lan-
guage of the provision is addressed to the course of the legis-
lature.   Unless the nature and extent of the right conferred
and of the liability imposed is fixed by the provision itself, so
that they can be determined by examination and construction,
and there is no language used indicating that the subject is
referred to the legislature for action, the provision is not self-
executing, and is addressed to the legislature.   It is not self-
executing unless it supplies a sufficient rule by means of which
the right given may be enjoyed and protected, or the duty im-
posed of which the right given may be enjoyed and protected
or the duty imposed may be enforced.   Merely indicating
principles without laying down rules to give them force is not
sufficient.    Cooley, Const. Lim., 99, 48 Minn., 150.

The clear purpose being that the legislature, not the auditor,
or any other officer or power, shall fix the interest at six per
centum after the legislature, not the auditor nor the executive
authorities of any institution, shall ascertain the exact amount
" for which the state is responsible " and upon which the six
per cent shall be calculated.   The constitution unquestionably
leaves to the legislature the power to find and decide the sum
" for which the state is responsible."   It was never intended
to commit to the auditor or any other official, or authority, the
extraordinary power of deciding, even upon a report of the
sale of trust lands, what amount the state was responsible for,
and it is only the funds " for which the state is responsible,"
as ascertained by the legislature, that the six per cent is to be
computed by the legislature.   It is next to flippancy to con-
tend that matters of such grave importance are left by the

constitution to mere accounting officers, or to the agencies of school government.

After fixing the amount "for which the state is responsible," and finding the amount of the interest thereon, calculated at the rate of six per centum, then, in the reasonable and logical view of what the convention intended, the amount of interest so found should be appropriated by the legislature and charged by the auditor to the institution and credited by draft drawn against it on the first of May and November, and so with all trust funds for educational purposes for which the state is responsible. The "distribution of said interest, that is, all for which the state has been by the legislature held liable, not only to the Industrial Institute and College, but to all educational institutions shall be distributed as the legislature shall direct, the time for distributing and rate of interest alone being fixed. Six per centum on the first of May and November.

The claim for this interest as being due upon a fund " for which the state is responsible" is one that presents to the auditor a duty to examine and a right to exercise his judgment and discretion as to its legality. There is nothing in the petition showing that the legislature or any other authority had fixed either amount or liability of the state, not even official notice that the state has assumed responsibility for any of said sum. In such case a mandamus will not lie to compel the auditor to issue that warrant which he has refused to issue. Whatever specific reason he may have given the " executive committee," he is entitled to all defenses here. To compel him to issue the warrant in such case would be to " give to the judiciary the key to the treasury and complete control over the funds of the state, and to deprive the legislature of all power over the treasury of the state by making its executive officers amenable, not to the power which appointed them, but to the varying, and perhaps conflicting judgments of the various tribunals to show applications may be made for writs of man-

damus to adjust and determine claims against the state.'' *Swan* v. *Buck*, 40 Miss., 268 (280); see specially § 229, code 1892.

''Appropriations,'' as used in our constitution and code has reference solely to legislative appropriations. The exception in § 230 of the code to cases specifically provided for by law, has reference to some other law giving specific instruction to the auditor. This section deals directly with the duties of that officer, and not with the manner of otherwise making appropriations. .So, with §§ 231, 232, 233, 235. These sections follow up the prohibition in § 230 by a command as to the form and contents of his warrant. Section 235 is definite and specific in the command that he ''shall cite in or upon each warrant issued by him  .  .  .  the section of this code, or the section or page of any other book of statutes, or the date of approval and title of the act of the legislature if the same (the legislative authority) be not published in a book, which authorizes the issuance thereof; and a warrant issued without such citation shall not be paid by the treasurer.'' So, finding no authority in sec. 212 of the constitution especially authorizing this particular officer to issue this especial warrant, it cannot be said that it was a duty resulting from his office to issue it, hence he did right to decline and cannot be coerced by a court. His duties are not only fixed by law, but the precise manner, as to the issuing of warrants on the treasurer in the performance of those duties, is specifically prescribed not only in mere form, but by emphatic commands and prohibitions. All of his duties are statutory; the constitution does not undertake to prescribe them.

The continued exercise of the power by the legislature, from the adoption of the constitution, to ascertain and fix the amount for which it is liable for the several educational trust funds, and to make appropriations.to meet the interest thereon, ought to be conclusive evidence in this matter that the interest cannot be otherwise distributed or paid. *Mayhew's case*, 2 Gil. (Md.), 487.

The general rule of construction that when a constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one, or the performance of the other is modified by the equally well fixed rule that, there are means for the exercise of a granted power, or performing the duty enjoined are also given, no other or different means or powers can be implied, either on account of convenience or of being more effectual. *Field's case* (Ill.); 2 Seammon's Rep.; 3 Am. & Eng. Ency. Law, p. 680 (4).

Chapter 185, vol. 28, of the acts of congress devotes the proceeds of the lands therein granted to this college. So far from fixing any rate of interest, no conditions whatever are imposed. If sec. 212 referred exclusively to the debts due educational funds by the state, and had no prospective bearing, then this fund has not so far as said act is concerned, the benefit of the rate of interest in sec. 212 named, or of the semi-annual payments thereof as therein specified. If the section is prospective, and congress looked to it in making the donation, then congress expected the donation to be accepted with the rate of interest and time for the payment thereof fixed, to be distributed at that rate and time, in such manner as the legislature might provide. Whether sec. 212 is prospective or not, and whether congress looked to it or not, the act reserved no conditions, as to interest or otherwise, save that the fund be forever held for said college, and, so long as so held, faith will be kept with congress whether interest is paid or not. The act does not prohibit the use of the corpus of the fund for the college. At all events, it is not true that the grant and the legislature's acceptance constituted such a contract as to entitle the trustees to take this fund and hold it forever and collect the interest. On the contrary, the legislature specifically provided in sec. 3 of ch. 45 of the laws of 1898, that the interest should "be paid to said college, under and in accordance with sec. 212 of the state consti-

tution,'' which, in view of the previous practice and custom of
the state in that respect, was by appropriation by the legisla-
ture to which the expenditure thereof should be reported, even
in detail according to the limited allowances for each desig-
nated purpose.    In this view ch. 45 of the laws of 1898
was enacted and not otherwise.

There are no contractual relations between this state and the
federal government in this matter.    It is a donation to the
college, pure and simple, of the proceeds of lands placed in
the hands of the state as trustee, with the injunction that
the money shall be held for this college, the integrity
and honor of the state being securely relied upon by the
donor for the faithful execution of the trust.    There is no
place for the statement that the state is a trustee-debtor.    The
fact will not be overlooked that the act of congress fixes no
rate of interest, time of payment, or any other condition save
that it be held sacred by the state for the purposes specified.
So far as compliance with that act is concerned, the land has
been sold and every dollar paid into the state treasury to the
credit of the institution; hence no complaint by the federal
government of any violation of the trust imposed, nor could
there be upon the facts stated in the petition.    The quarrel is
purely local, affecting administrative matters only.

The unquestioned purpose of the donation to this college was
to aid the objects and purposes for which it was instituted and
to promote its perpetuity.    There is nothing in the petition
even tending to show that the purposes of the donation are in
the slightest danger.    In its last analysis the complaint seeks
to enforce a supposed naked legal right to have this interest
paid into the treasury of the institution in the face of the
undeniable fact that it is abundantly provided for in every
particular and that no harm is threatened by reason of with-
holding the interest until the legislature shall see proper to
appropriate it.    It is most unquestionably the part of wisdom
not to deliver over to the institution this interest that can only

be used in its support and maintenance and other purposes already supplied provided for the years 1902 and 1903. The demand that it shall be paid, regardless of all considerations, in May and November, is technical at most. But, at all events, that demand can be made only in May and November after the state has acknowledged its responsibilty, fixed the amount of its liability and set apart or appropriated funds to meet it. It is a misconstruction to say that the constitution positively directs the payment of this interest at all hazards on the first day of May or November after the money goes into the treasury. The constitution means that these payments are to be made after the state has acknowledged its liability, as aforesaid, and, having done so, makes appropriations to meet them for two years in advance. Sums coming into the treasury between sessions of the legislature cannot affect the calculation, for the reason that each legislature provides for the maintenance and support of those colleges for two years, and nothing can be lost to them in the way of interest, because the calculation of that will date from the date of payment into the treasury and not from the date of acknowledgment of liability by the state. Hence it is that the scheme is perfect in its operation throughout.

It is believed to be hardly necessary to go into a discussion of the foundation principles of donations of this character. It is immaterial, for the purposes of this case, whether the federal government held these lands itself in trust for the people of this state, and that in making a donation to a college in this state, making the state trustee, the federal government but surrenders to the state what logically belongs to her. Nor is it deemed necessary to discuss the proposition as to what would become of this fund should the state find it wise to discontinue or abolish the institution which is the beneficiary of the federal government. Counsel argued strenuously that Congress had in view sec. 212 of the state's constitution when the donation was made. Perhaps this is true. However that

may be, it cannot be questioned but that congress also had in view the fact that the object of its donation, the Industrial Institute and College, was a creature of legislative action, subject to legislative control, and entirely depending upon the legislative will for its existence; nevertheless reserved no right to reversion upon the happening of any contingency that might destroy the college. This leads us to the true theory of this case respecting even the corpus of principal fund. That is to say, when the congress of the United States placed this money in the hands of the State of Mississippi with an injunction (and that is what it amounts to) to hold it sacred for this college, the dignity, honor and integrity of the state was relied upon implicitly. If, for any cause, the college should be abolished, not as much as a demand would ever be made of the state to return this money to the federal treasury. Indeed there is no provision made by law by which the state could be proceeded against in case the object of the donation, in the judgment of the legislature, failed in its purpose and should not be further maintained.

Argued orally by *Edward Mayes*, for appellant, and by *Monroe McClurg*, attorney-general, for appellee.

TERRAL, J., delivered the opinion of the court.

There are in our constitution many provisions that are self-executing, and not requiring legislative action to make them effective ; but they are unmistakable from their terms, and manifestly sec. 212 is not one of this character. It does no more than fix the rate of interest on trust funds held by the state at six per cent, and to direct its semi-annual distribution leaving to the legislature the carrying into effect of the sovereign will as thus expressed. Who is to make the distribution, and to whom, and out of what funds, and in what manner? The means of payment and all the details are for the legislature to provide. What means has the state for payment, except by

taxation? It devolves on the legislature to provide by taxation for the maintenance of the state government in all its departments and the discharge of all its obligations. The state has no means of existence except by the exercise of the sovereign power of taxation. The constitution does not impose any taxes, except the poll tax by sec. 243, and must be held to have left the discharge of the obligation declared by sec. 212 to be by the legislature, on which it devolves to provide ways and means for the discharge of all obligations of the state. There is no just ground for the supposition that the framers of the constitution intended to dispense with legislative action as to the payment of interest on trust funds, and to require it as to maintaining the existence of the state government, which cannot live without money, and cannot get money without legislative action. Not an officer of the state can be paid his salary except with money raised by taxation, and after appropriation therefor by the legislature. The members of the legislature are dependent upon the same provisions for their pay. No money can come into the treasury or go out of it lawfully except as directed by legislative act. Collection and disbursement of public money belong to the legislature, and must be done as it directs. A state treasurer and an auditor are provided for by sec. 134 of the constitution, but it was left to legislation to prescribe their duties, and the provisions of the code of 1880 as to these were continued in force as provided by sec. 274 of the constitution. These were brought forward in the code of 1892, and among them is § 230, prohibiting the auditor from drawing "warrants without or in excess of appropriations of money for the purpose, *except in these cases specifically provided for by law.*" The clause italicized, entirely proper in the code of 1880, under the constitution of 1869, which allowed permanent or standing appropriations, has no place under the constitution of 1890, which, by sec. 63, forbids any appropriation which does not fix definitely the maximum sum thereby authorized to be drawn from the

treasury, while sec. 64 prohibits any appropriation of money out of the state treasury from continuing in force longer than six months after the meeting of the legislature at its next regular session; and also requires the votes of a majority of all members elected to each house of the legislature to pass an appropriation bill. Thus the constitution has placed the whole matter of obtaining money by taxation (except as to the poll tax mentioned) and of disbursing it in the hands of the legislature, guarded and restricted as stated. There cannot be such appropriations from the state treasury, under the constitution of 1890, as were allowable by that of 1869, and with reference to which the last clause of § 230 was appropriate. Now, as already said, no salary or other obligation of the state can be lawfully paid, except out of an appropriation therefor by the legislature definitely fixing the maximum sum which may be drawn on that account. And although there are in the code several provisions directing the auditor to issue warrants, he cannot lawfully issue any except to pay out of an appropriation therefor fixing definitely the maximum sum which may be drawn, and also not continuing beyond six months after the meeting of the legislature at its next session. It seems to us perfectly clear that the auditor rightly refused to issue his warrant in this case, and the judgment of the circuit court is therefor affirmed.

WHITFIELD, C. J., took no part in the decision of this case.