CARO E. COLBERT *v.* STATE OF MISSISSIPPI.

1. STATE BONDS. *Retirement. Options. Exercise. Constitutional law. Legislative or executive power. Laws* 1896, *p.* 30, *ch.* 34, *sec.* 7.

 Where an act of the legislature authorizing the issuance of state bonds, as Laws 1896, p. 30, ch. 34, sec. 7, provides that the state shall have the option to retire the bonds before their maturity, the option can be exercised only by the legislature, and in the absence of a specific appropriation for their payment the governor is unauthorized to order the bonds paid out of other money in the state treasury.

2. SAME.

 Constitution 1890, secs. 63, 64, 68, 69, 73, 116, and 123, referred to, commented upon, and applied.

FROM the circuit court of, first district, Hinds county.

HON. DAVID M. MILLER, Judge.

Colbert, the appellant, was plaintiff, and the state of Mississippi, the appellee, defendant in the court below. From a judgment in defendant's favor the plaintiff appealed to the supreme court. The section of Code 1892 which permits the state to be sued is as follows:

"4248 (2641). *When the state may be sued.*—Any person having a claim against the state of Mississippi, after demand made of the auditor of public accounts therefor and his refusal to issue a warrant on the treasurer in payment of such claim, may, where it is not otherwise provided, bring suit therefor against the state, in the court having jurisdiction of the subject-matter which holds its sessions at the seat of government; and if there be no such court at the seat of government, such suit may be instituted in such court in the county in which the seat of government may be."

The facts are stated in the opinion of the court.

*Alexander & Alexander,* for appellant.

The statute says: "The state shall have the option to retire any and all of these bonds." Unless the governor is the state, he could not exercise the option. We do not attribute to the governor any intentional usurpation of authority. It might have been wise to have given him the power. By his act, whether legal or not, and the voluntary compliance by bondholders with the call, he saved the state thousands of dollars in interest. But the power of the governor or other officials is not to be determined by considerations of expediency. The governor has certain well-defined duties and powers. There is but one section of the constitution that grants him power in general terms. "The chief executive power of the state" is vested in him—not all of the power, but the chief executive power. All other sections grant power in express terms, unless it be the injunction "to see that the laws are faithfully executed." Constitution 1890, sec. 122, and sec. 7 of the act of 1896 was not a grant of power at all. It was a mere requirement that the bonds should be payable after five years, if the legislature should so decide. The legislature without any grant had the power to pay any indebtedness of the state unless by its contract it had deprived itself of the power. The legislature is only limited in its power by the state and federal constitutions, and perhaps the nature of our government. But the governor is an official who has only such power as is granted to him by the constitution or by the legislature. His power is executive in its nature. He executes laws, but does not enact them. When the state is mentioned in a statute, it does not mean the governor. The saying of Louis XIV., *"L'etat c'est moie,"* may pass in an absolute monarchy, but not in republican America or democratic Mississippi.

Executive power, such as is granted to a governor, is that appertaining to the execution of laws as they exist. 23 Fla., 298; 24 Mich., 441.

The general grant of executive power excludes by implication

all other departments from the exercise of · such power. Cooley on Constitutional Law (6th ed.), 104; Story on Constitution, secs. 518–525; *Fox* v. *McDonald,* 101 Ala., 51; *Bridges* v. *Shallcross,* 6 W. Va., 573. *E converso,* the grant to the legislature of the legislative power that is to make, alter, or repeal laws, excludes this power from the executive.

*J. N. Flowers,* assistant attorney-general, for appellee.

The appellant endeavors to make the issue here whether or not the governor is "the state." We think this is not the issue. We are not concerned with the inquiry as to who or what is the state. We do not insist that the governor is the state; that proposition is denied. We deny that the legislature is the state, and we deny that the supreme court is the state. None of these, in fact, is the state. It takes all of them to make up the state.

And we submit here, too, that if sec. 7 of the act of 1896 could be given no effect until "the state" should be located, then the option reserved is worthless. The ideal, intangible, indescribable entity known as "the state" could never be found to exercise the option. And if that being should appear and proclaim its intention to call in the bonds, not a bondholder would have the courage to appear. An appearance of Gabriel with his trumpet would be tame in comparison. The bondholders jest with the court when they insist that they wanted "the state" to appear on the scene and call in the bonds.

Our inquiry is rather, Which department of the state government should speak for the state in the exercise of the option reserved? What character of act was required to be done? Was it a legislative, executive, or judicial act required?

There is no pretense that any judicial action was called for, nor can it be seriously contended that further legislative action was necessary. The act is plain and expresses the whole intention of the legislature. It needed nothing but execution. It was sufficient in itself and needed no further legislation to put

it into effect. It does not provide that the state shall exercise the option, but that the option is reserved to the state. The state possesses the right, and we only wish to find out who should exercise the right.

If it be true that the act needed nothing but execution, then the question is settled by sec. 123 of the constitution, which provides that the governor shall see that the laws are faithfully executed. If the exercise of the option reserved by the act of 1896 belongs to the class of powers known as executive powers, then it follows that the governor properly issued his call, since it is his duty to enforce all the laws, whether he is specifically named or directed or not.

As far as the legislature itself is concerned, the question has already been settled. The legislature has construed the law and indorsed the action of the governor. This has been done not once, but every time the occasion has arisen since the bonds were called in, in the year 1901. *Field* v. *Clark,* 143 U. S., 649; *Consolidated Coal Co.* v. *Illinois,* 185 U. S., 203 (46 L. ed., 872); *Butterfield* v. *Stranahan,* 192 U. S., 470 (48 L. ed., 525); *Schulherr* v. *Bordeaux,* 64 Miss., 59, 71.

Argued orally by *C. H. Alexander,* for appellant, and by *J. N. Flowers,* assistant attorney-general, for appellee.

Cox, J., delivered the opinion of the court.

On July 1, 1896, pursuant to an act of the legislature approved March 18, 1896, there were sold bonds of the state of Mississippi of the denomination of $500 each, bearing interest at 5 per cent per annum, payable semiannually, to the amount of $400,000. These bonds on their face were to become due and payable on the 1st day of July, 1906, and were designated as "Series B." On the 4th day of June, 1901, Gov. Longino issued his proclamation, giving notice to all holders of the said bonds to present the same on July 1, 1901, to the treasurer of the state of Mississippi, at his office in the capitol in the city

of Jackson, for payment in full with accrued interest. The proclamation announced that interest would cease on the said bonds from and after the 1st day of July, 1901. Caro E. Colbert, plaintiff below and appellant here, was the owner of fifteen of the said bonds. He declined to present them for payment on July 1, 1901, as called for in the governor's proclamation, but on January 1, 1902, he presented the said bonds, together with the interest coupons then maturing, to the state treasurer for payment. The bonds were promptly paid, but the treasurer refused to pay the coupons on the sole ground that the call of the governor operated to retire the bonds and stop the running of interest after the date fixed for retiring them. Plaintiff thereupon made demand of the auditor to issue a warrant for the amount of the coupons, and the auditor refused to do so; whereupon suit was instituted against the state before J. Fitzgerald, a justice of the peace of Hinds county, and judgment recovered for $187.50, the amount of the said interest coupons, with interest from January 1, 1902, and costs. Upon appeal to the circuit court of Hinds county, judgment was rendered for the state, dismissing the suit. From this judgment an appeal has been prosecuted to this court, appellant assigning for error the action of the court in dismissing his suit.

The principal question arising, upon the record in this case, and one upon which both parties thereto invite a deliverance from this court, is whether or not the governor had authority of law to call in the bonds of series B for payment on July 1, 1901. It is contended on behalf of the state that authority for this act of the governor is found in sec. 7, ch. 34, p. 30, Acts 1896, the same being the act under which the said bonds were issued. It reads as follows: "Sec. 7. The faith and credit of the state of Mississippi are hereby pledged to the punctual payment of both principal and interest of said bonds as they mature, and to that end the legislature shall annually levy a tax on all the taxable property of the state for the payment of

the interest thereof, and at the expiration of five years the state
shall have the option to retire any or all of these bonds." It is
urged that the governor, as the chief executive of the state, was
the functionary whose right and duty it was to exercise the state's
discretion, thus clearly provided for in the act under which the
bonds were issued, to call the same in for payment. It is mani-
fest that the authority to call in the bonds was not given to the
governor in express terms by sec. 7 of this act of 1896. It
is claimed, however, that this authority is to be clearly inferred
in view of the character of the act to be done and the nature of
the powers conferred by the constitution upon the governor as
chief executive of the state. The general grant of power to the
governor under our constitution is to be found in secs. 116 and
123 of that instrument, the one declaring that "the chief ex-
ecutive power of this state shall be vested in a governor," the
other enjoining that "the governor shall see that the laws are
faithfully executed." It is claimed that by virtue of his duty
and obligation to see that the laws are faithfully executed, the
governor was vested with power to call in the bonds in question.
A sufficient reply to this contention is that as to the matter in
question there was no law to be executed. No provision of the
statute under which the governor assumed to act required either
absolutely or upon conditions that the bonds should be called
in before maturity. No law would have been violated if the
call had not been made. The law under which the bonds were
issued having provided that they should mature on July 1,
1906, they were not, under the law, subject to payment before
that date, save in the exercise of a discretion reserved generally
to the state, not granted specifically to the governor. So that
to our minds it is perfectly clear that the governor was without
authority to call in the bonds, unless the exercise of the state's
discretion as to that matter was in its essential nature an execu-
tive function, vested in the governor by the grant to him of
the chief executive power. Just here we touch the heart of
the controversy. It is maintained on behalf of the state with

great earnestness and force of reasoning that the discretion re-
served to the state was an executive discretion, pertaining strict-
ly to the executive department of the government, belonging,
by its very nature, to that particular magistracy, and not re-
quiring any legislative grant to vest it in the governor as chief
executive. We cannot concur in this opinion. We have not so
learned the law. The principle contended for is contrary to the
genius of republican government. Under all constitutional gov-
ernments recognizing three distinct and independent magis-
tracies, the control of the purse strings of government is a leg-
islative function; indeed, it is the supreme legislative pre-
rogative, indispensable to the independence and integrity of
the legislature, and not to be surrendered or abridged, save by
the constitution itself, without disturbing the balance of the
system and endangering the liberties of the people. The right
of the legislature to control the public treasury, to determine
the sources from which the public revenues shall be derived
and the objects upon which they shall be expended, to dictate
the time, the manner, and the means, both of their collection
and disbursement, is firmly and inexpugnably established in
our political system. This supreme prerogative of the legisla-
ture, called in question by Charles I., was the issue upon which
parliament went to war with the king, with the result that ulti-
mately the absolute control of parliament over the public treas-
ury was forever vindicated as a fundamental principle of the
British constitution. The American commonwealths have fallen
heirs to this great principle, and the prerogative in question
passes to their legislatures without restriction or diminution,
except as provided by their constitutions, by the simple grant
of the legislative power.

In the light of this great dominating principle of republican
government, we feel constrained to hold that the option of the
state in the instant case fell naturally and peculiarly within
the sphere of legislative, rather than of executive, discretion.
We do not deny, of course, that the legislature might, in its

discretion, have provided for the calling in of the bonds by the governor upon such conditions and limitations as it might have seen fit to impose. Such a delegation of power to the governor (if it may be properly called a delegation of power where the legislature exercises its discretion in commanding executive action upon the happening of certain prescribed conditions) is not infrequent under our system, and is maintainable not only by a long line of authorities, but also upon fully established principles of government. The vice in this branch of the argument for the state is to be found not in the contention that the legislature had the power to confer upon the governor authority to call in the bonds, but in the assumption that it actually did so. In express terms, most certainly it did not. Such power is not to be conferred by doubtful inference. The failure of the legislature itself to exercise the state's option, when recommended so to do by Gov. McLaurin, raises a strong presumption that it was not its purpose that any other department of the government should do so. It was fully advised of the state's rights in the premises, it is conclusively presumed to have known of its undoubted prerogative to determine the state's choice, and its failure to act was in itself an expression of the legislative purpose that the bonds of series B should not be called in at the expiration of five years. The fact that the legislature, at the session of 1900, after making specific appropriation for payment of interest for the ensuing two years on certain designated debts of the state, appropriated the sum of $58,240 for each of the years 1900 and 1901 for payment of interest on other state indebtedness, strengthens the presumption, if that be possible, that it was not the legislative intent that the bonds of series B should be called in and paid on July 1, 1901. The bonds of series B must necessarily have been included in the words "other state indebtedness," and the fact that the same amount was appropriated for the payment of interest for each year shows clearly that the legislature contemplated

that the said bonds would remain outstanding and interest-bearing for the whole of the year 1901.

But even if it should be conceded that the exercise of the state's option was an executive, rather than a legislative, function, or, this being denied, if it be conceded that the legislature intended, and, in effect, commanded, that the governor exercise the state's option, still, in our judgment, the governor was without power to order the bonds in question paid, for the simple reason that the legislature had made no appropriation for their payment. Such an order, under such circumstances, was virtually an executive appropriation of the money required to pay the bonds. The proposition so stated is its own refutation. Legislative control over the treasury, which we recognize as the supreme legislative prerogative, involves the necessity of legislative appropriation in order to the payment of moneys out of the treasury. This is a fundamental principle of constitutional law. It is written in express terms or by necessary implication in the constitutions of all free states. Clause 7, sec. 9, art. 1, of the constitution of the United States declares that "no money shall be drawn from the treasury but in consequence of appropriations made by law." The constitution of Mississippi of 1869 declared that "no money shall be drawn from the treasury, except on appropriations made by law." Vide sec. 26, art. 4. The constitution of 1832, art 7, sec. 7, declared that "no money shall be drawn from the treasury but in consequence of an appropriation made by law;" and the same provision in the same language is found in the constitution of 1817, art. 6, sec. 8, under which Mississippi was admitted to the federal union. We cannot be persuaded that the omission from the constitution of 1890 of a similar express provision indicates a purpose upon the part of the great jurists and publicists who framed that instrument to abrogate this essential principle of constitutional government. This fiscal scheme which they provided and ordained negatives the idea. By sec. 63 of the constitution it

is provided that "no appropriation shall be passed by the legislature which does not fix definitely the maximum sum thereby authorized to be drawn from the treasury." By sec. 64 it is provided that "no bill passed after the adoption of this constitution to make appropriations of money out of the state treasury shall continue in force more than six months after the meeting of the legislature at its next regular session, nor shall such bill be passed except by the votes of a majority of all the members elected to each house of the legislature." Section 68 declares that "appropriation and revenue bills shall, at regular sessions of the legislature, have precedence in both houses over all other business, and no such bills shall be passed during the last five days of the session." Section 69 requires that: "General appropriation bills shall contain only the appropriations to defray the ordinary expenses of the executive, legislative, and judicial departments of the government, to pay interest on state bonds, and to support the common schools. All other appropriations shall be made by separate bills, each embracing but one subject. Legislation shall not be engrafted on appropriation bills, but the same may prescribe the conditions on which the money may be drawn and for what purposes paid." Section 73 empowers the governor to veto parts of any appropriation bill and approve parts of the same, and declares that the parts approved shall be law. When we consider all these provisions together, and note the jealous and wise restrictions imposed by the constitution upon legislative power in the matter of the appropriation of public moneys, we are constrained to believe that the constitution regards the legislature as the sole repository of power to make appropriations of moneys to be paid out of the state treasury. We can no more infer the possibility of an appropriation by executive action of moneys for the payment of public debts than we could the levying of taxes by executive action for the same purpose. If the one may be inferred, the other may also, and thus the entire con-

stitutional scheme for legislative control over the public reve-
nues be subverted.

It cannot be maintained that the act which provided for the
issuance of the bonds and reserved to the state an option to pay
them at the expiration of five years was in itself an appropria-
tion of money to pay the bonds at the end of five years.   The
creation of a debt is an entirely different thing from an appro-
priation for its payment.   But even if the act had amounted to
an appropriation, it must necessarily have failed, under sec.
64, upon the expiration of six months after the meeting of the
legislature at its next regular session.   A view almost identical
with the one now considered was pressed upon this court by
counsel widely famed for their great learning and power in the
somewhat recent case of *State of Mississippi* v. *Cole,* generally
known as the "Industrial Institute and College Case."   See 81
Miss., 174 (32 South. Rep., 314).   It was insisted with great
cogency and persuasiveness of argument that sec. 212 of the
constitution, which provides that "the rate of interest on the
fund known as the Chickasaw school fund, and other trust
funds for educational purposes for which the state is respon-
sible, shall be fixed, and remain as long as said funds are held
by the state, at six per centum per annum from and after the
close of the fiscal year A.D. 1891, and the distribution of said
interest shall be made semiannually on the first days of May
and November of each year," was in itself an appropriation,
self-operative and altogether sufficient, of money for the pay-
ment of interest on a debt solemnly declared by the constitution
itself, which directed that the distribution of. interest thereon
should be made semiannually on the first days of May and
November of each year.   Surely, if there could ever be a case
in which the creation or declaration of a debt would operate as
an appropriation for its payment, that were the case.   And yet
appellant's contention as to the appropriations by inference or
intendment was repudiated by this court in a very clear and
strong opinion delivered by that learned and righteous judge,

Justice Terral. We quote at some length from the opinion because it is apposite in the instant case, and states most perspicaciously the views of this court as now constituted: "Who is to make the distribution, and to whom, and out of what funds, and in what manner? The means of payment and all the details are for the legislature to provide. What means has the state for payment except by taxation? It devolves on the legislature to provide by taxation for the maintenance of the state government in all its departments and the discharge of all its obligations. The state has no means of existence except by the exercise of the sovereign power of taxation. The constitution does not impose any taxes except the poll tax by sec. 243, and must be held to have left the discharge of the obligation declared by sec. 212 to be by the legislature, on which it devolves to provide ways and means for the discharge of all obligations of the state. There is no just ground for the supposition that the framers of the constitution intended to dispense with legislative action as to the payment of interest on trust funds, and to require it as to maintaining the existence of the state government, which cannot live without money, and cannot get money without legislative action. Not an officer of the state can be paid his salary except with money raised by taxation and after appropriation therefor by the legislature. The members of the legislature are dependent upon the said provisions for their pay. No money can come into the treasury or go out of it lawfully except as directed by the legislative act. Collection and disbursement belong to the legislature, and must be done as it directs. . . . Thus the constitution has placed the whole matter of obtaining money by taxation (except as to the poll tax mentioned) and of disbursing it in the hands of the legislature, guarded and restricted as stated. . . . Now, as already said, no salary or other obligation of the state can be lawfully paid except out of an appropriation therefor by the legislature definitely fixing the maximum sum which may be drawn on that account." This opinion evinces a full grasp

upon the part of the court of the doctrine of legislative control, except as limited by the constitution, over the collection and disbursement of the state's revenues. It would be difficult to add to its force or to improve upon its admirable terseness and lucidity. It alone would be determinative of the case at bar. The legislature, under our system, having control of the public revenues, can alone provide for the payment of the public debts. It therefore is the guardian of the public credit, and is charged with the entire responsibility for the maintenance of the public faith and honor. A mere failure upon its part to make appropriation for the payment of public indebtedness, persisted in, would amount to repudiation; for without a legislative appropriation the creditor of the state is without power to enforce collection.

We will not be deterred from declaring these principles because of any administrative construction and practice to the contrary. If such practice has grown up under a mistaken conception of the law, it should be at once abandoned. No false construction of the constitution by any administrative department, however long continued, can ever ripen into law. Nor do we share the fears of the learned counsel for the state, who anticipates appalling consequences from a decision adverse to the state. The creditors whose bonds were paid on July 1, 1901, have suffered no wrong. Their presentation of them for payment was, in law, purely voluntary. By accepting payment and surrendering the state's obligations, they absolved the state from all further liability, both for principal and interest. The treasurer who made the payment cannot be injured. Should the state demand and enforce from him payment into the treasury of the money illegally paid upon the bonds, he would be immediately subrogated to the rights of the creditors whose bonds had been paid. The state has not suffered, and cannot suffer, so far as we are able to see, any injurious consequences from a declaration by this court that the action of the governor was unwarranted and void. It has saved thereby some thou-

sands of dollars of interest, and will only, by virtue of this decision, be liable to pay the interest, which the statute clearly contemplated should be paid, on those bonds of series B which were not presented for payment under the governor's call. The demand of appellant was a liquidated demand. The money had been appropriated for its payment. It was a proper claim for audition. The auditor having refused to audit and allow it, the appellant had the right under the statute to bring his suit to have its validity judicially determined.

*Reversed and remanded.*