THE NEBRASKA COALITION FOR EDUCATIONAL EQUITY AND ADEQUACY (COALITION), ON ITS OWN BEHALF AND ON BEHALF OF ITS MEMBERS, ET AL., APPELLANTS AND CROSS-APPELLEES, V. DAVID HEINEMAN, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF NEBRASKA, ET AL., APPELLEES AND CROSS-APPELLANTS.
731 N.W.2d 164

Filed May 11, 2007. No. S-05-1357.

Robert V. Broom, of Broom, Johnson, Clarkson & Lanphier, and David C. Long for appellants.

Jon Bruning, Attorney General, Dale A. Comer, Charles E. Lowe, and Leslie S. Donley, and Mark C. Laughlin, Michael L. Schleich, and Timothy J. Thalken, of Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C., for appellees.

David M. Pedersen, Jill Robb Ackerman, and Elizabeth Eynon-Kokrda, of Baird Holm L.L.P., for amici curiae Douglas County School District 0001 et al.

Rebecca L. Gould for amici curiae Joseph E. Lutjeharms et al.

Jeffery R. Kirkpatrick, of McHenry, Haszard, Hansen, Roth & Hupp, P.C., L.L.O., for amici curiae Nebraska Farmers Union and The South Platte United Chambers of Commerce.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

This appeal presents a constitutional challenge to Nebraska's education funding system. The Nebraska Coalition for Educational Equity and Adequacy and other plaintiffs (collectively the Coalition) filed a declaratory judgment action. It alleged that the funding system does not provide sufficient funds for an "adequate" and "quality" education. It further alleged the funding inadequacy violates the free instruction and religious freedom clauses of the Nebraska Constitution. The Coalition seeks (1) a declaration that Nebraska's Constitution requires "an education which provides the opportunity for each student to become an active and productive citizen in our democracy, to find meaningful employment, and to qualify for higher education"; (2) a declaration that Nebraska's education funding system is unconstitutional; and (3) an injunction enjoining state officials from implementing the system.

The district court determined the Coalition's allegations that the Legislature had failed to provide sufficient funds to provide for an adequate education posed a nonjusticiable political question. We agree with the district court's reasoning and, accordingly, affirm.

## I. CONSTITUTIONAL PROVISIONS

The Coalition claims that Nebraska's education funding system violates two separate provisions of the Nebraska Constitution: the religious freedom clause[1] and the free instruction clause.[2] The Coalition relies on the following sentence in the religious freedom clause: "Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the Legislature to pass suitable laws . . . to encourage schools and the means of instruction."[3] The free instruction clause provides in relevant part: "The Legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years."[4]

## II. BACKGROUND

The Coalition consists of 43 school districts. The other plaintiffs are two separate school districts in Colfax County, Nebraska, and four individuals in their capacities as taxpayers, school board members or officers, and parents of children in the two school districts. All of the State defendants are named in their official capacities, including: the Governor, the State Treasurer, the Director of Administrative Services, the Property Tax Administrator, the Commissioner of Education, and members of the State Board of Education (collectively the State).

All of the appellant school districts provide free instruction to their students. In the 2002-03 school year, local, state, and federal expenditures on grades K through 12 public education in Nebraska exceeded $2 billion. In fiscal year 2003-04, the State of Nebraska spent almost $780 million in direct state aid to education, including special education. This amount comprised almost 29 percent of the total state budget.

### 1. THE COALITION'S ALLEGATIONS

In its operative complaint, the Coalition alleged that the religious freedom and free instruction clauses had independent

---

[1] Neb. Const. art. I, § 4.

[2] Neb. Const. art. VII, § 1.

[3] Neb. Const. art. I, § 4.

[4] Neb. Const. art. VII, § 1.

meaning and that the Legislature's enactments on education were evidence of that meaning. Specifically, the Coalition alleged the Legislature has statutorily set forth the elements of a quality education in its mission statements for public schools[5] and in its requirements under the Quality Education Accountability Act.[6]

The Coalition alleged that the school funding system[7] fails to provide sufficient resources for an adequate education; that the school funding system fails to accurately assess the needs of small school districts because it does not reflect the real costs of services or the effects of growth caps on their budget and levy caps; that in 2003, the Legislature shifted more of the burden for funding onto local property tax bases by cutting state aid and increasing the local levy cap; and that because the funding system relies heavily on inadequate property tax bases, the system fails to provide sufficient resources and facilities. It also alleged that unlike services to special education students, services to English language learners and low-income students do not authorize school districts to exceed their budget caps.

To show that the funding was inadequate, the Coalition alleged that the plaintiff districts were unable to (1) adequately pay and retain teachers; (2) purchase necessary textbooks, equipment, and supplies; (3) replace or renovate facilities; and (4) offer college-bound courses, advanced courses for high-ability students, technology, and other extra-curricular courses, or adequate services for special education, English language learners, and vocational programs. The Coalition also alleged that a significant number of students did not graduate and that a significant number were academically deficient, as shown by assessment tests.

The Coalition asked the court to make three declarations. First, it sought a declaration that the religious freedom and free instruction clauses provide a fundamental right "to obtain free instruction which enables each student to become an active and

---

[5] See Neb. Rev. Stat. §§ 79-701 and 79-702 (Reissue 2003).

[6] See Neb. Rev. Stat. §§ 79-757 to 79-762 (Reissue 2003 & Cum. Supp. 2006).

[7] See Tax Equity and Educational Opportunities Support Act, Neb. Rev. Stat. §§ 79-1001 to 79-1033 (Reissue 2003 & Cum. Supp. 2006).

productive citizen in our democracy, to find meaningful employment, and to qualify for higher education." Second, it asked the court to declare that the State has violated the plaintiffs' constitutional rights by implementing an unconstitutional school funding system. Finally, it asked the court to declare that Nebraska's school funding system is unconstitutional because it (1) fails to provide adequate resources to provide the free education guaranteed by these sections, (2) adversely affects the finances and ability of school districts and their officials to meet their obligation to provide students with a constitutionally required education, (3) causes an unconstitutional expenditure of tax dollars, and (4) violates the rights of school districts and their officials to execute their statutory duties. The Coalition asked the court to enjoin the State from further implementing Nebraska's school funding system.

## 2. THE STATE RESPONDS

The State moved to dismiss under Neb. Ct. R. of Pldg. in Civ. Actions 12(b)(1) and (6) (rev. 2003). At a hearing on the motion, the State submitted several exhibits. A report from the Board of State Canvassers of the State of Nebraska showed that in 1996, the voters had rejected, by a vote of 506,246 to 146,426, an initiative that, in relevant part, would have amended the Nebraska Constitution. The amendment would have made "'quality education' . . . a fundamental constitutional right of each person" and made the "'thorough and efficient education' of all persons between the ages of 5 and 21 in the common schools . . . the 'paramount duty' of the state."

A report from the State Department of Education showed that total expenditures for Nebraska public education in the 2002-03 school year was about $2.15 billion. The State's biennial budget for fiscal years 2003-04 and 2004-05 showed that the Legislature continued reductions in school aid from the year before through 2007. The budget also shows that without an extension of the changes in the school aid formula, state aid to schools would have increased by $175 million in fiscal years 2005-06 and 2006-07. Both parties submitted materials on the history of the Nebraska Constitution.

### 3. DISTRICT COURT'S JUDGMENT

The district court did not address the State's motion to dismiss under rule 12(b)(1), but dismissed the claims under rule 12(b)(6). Because we have jurisdiction, the district court's failure to rule on rule 12(b)(1) is of no consequence to our analysis.[8] The court determined that the claims presented nonjusticiable political questions. It concluded that "'[t]here is a lack of judicially discoverable or manageable standards for resolving the issue of whether the Nebraska school funding system satisfies the constitutional requirements of "free instruction in [the] common schools" or "suitable laws."'"

### III. ASSIGNMENTS OF ERROR

The Coalition assigns that the district court erred in determining that all the issues presented by the amended complaint were nonjusticiable and therefore failed to state a cause of action.

In its cross-appeal, the State assigns that the district court erred in not dismissing the Coalition's complaint as failing to state a cause of action because (1) the Nebraska Constitution does not contain a qualitative right to an "adequate" or "quality" education, (2) Nebraska's education financing statutes are constitutional, and (3) the Coalition was not entitled as a matter of law to the declaration they sought regarding the Nebraska Constitution. Because we conclude that the case is nonjusticiable, we do not comment on the cross-appeal.

### IV. STANDARD OF REVIEW

Because the parties submitted evidence on the State's motion to dismiss, we pause to clarify our standard of review. Dismissal under rule 12(b)(6) should be granted only in the unusual case in which a plaintiff's allegations show on the face of the complaint that there is some insuperable bar to relief.[9]

■ Both parties, however, submitted evidence in support of or in opposition to the State's motion to dismiss for failure to state a claim. Rule 12(b)(6) provides that when a matter outside

---

[8] See *Anderson v. Wells Fargo Fin. Accept.*, 269 Neb. 595, 694 N.W.2d 625 (2005).

[9] *Johnson v. Johnson*, 272 Neb. 263, 720 N.W.2d 20 (2006); *Spear T. Ranch v. Knaub*, 269 Neb. 177, 691 N.W.2d 116 (2005).

of the pleadings is presented by the parties and accepted by the trial court, a defendant's motion to dismiss must be treated as a motion for summary judgment.[10] Rule 12(b) further provides that when a motion under this rule is treated as a motion for summary judgment, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion [for summary judgment] by statute."

"'[M]atters outside the pleadings'" include "'any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings.'"[11] We recently stated that when receiving evidence that converts a motion to dismiss into a motion for summary judgment, the trial court should give the parties notice of the changed status of the motion and a reasonable opportunity to present all material made pertinent to such a motion.[12] However,

> "[a] district court's failure to give formal notice that it will treat a motion to dismiss for failure to state a claim as a motion for summary judgment is harmless where the nonmoving party has submitted materials outside of the pleadings in support of its resistance to a motion to dismiss . . . ."[13]

We review the court's order as converting the State's motion to dismiss into a motion for summary judgment. Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[14]

---

[10] *Crouse v. Pioneer Irr. Dist.*, 272 Neb. 276, 719 N.W.2d 722 (2006).

[11] *Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 187 F.3d 941, 948 (8th Cir. 1999).

[12] *Doe v. Omaha Pub. Sch. Dist.*, ante p. 79, 727 N.W.2d 447 (2007), citing *Country Club Estates, L.L.C. v. Town of Loma Linda*, 213 F.3d 1001 (8th Cir. 2000).

[13] *Hamm, supra* note 11, 187 F.3d at 949.

[14] *City of Lincoln v. Hershberger*, 272 Neb. 839, 725 N.W.2d 787 (2007).

And whether a claim presents a nonjusticiable political question is a question of law.[15] When reviewing questions of law, we resolve the questions independently of the lower court's conclusion.[16]

## V. ANALYSIS

The overarching issue is whether the district court correctly concluded that the Coalition's claims present nonjusticiable political questions. The political question doctrine of justiciability is primarily a function of the separation of powers doctrine. It arises when a claim implicates the relationship between the judiciary and the coordinate branches of government.[17]

In Nebraska, to obtain declaratory relief, a plaintiff must prove the existence of a justiciable controversy and an interest in the subject matter of the action.[18] A justiciable issue requires a present, substantial controversy between parties having adverse legal interests susceptible to immediate resolution and capable of present judicial enforcement.[19]

### 1. SUMMARY OF PARTIES' ARGUMENT

The Coalition argues that (1) taken together, the religious freedom and free instruction clauses require the Legislature to provide a free education that "at a minimum, [is] sufficient to allow each student to become an active and productive citizen in our democracy, to find meaningful employment, and to qualify for higher education," and (2) that the Legislature has failed to perform this duty.[20]

---

[15] See, *Saldano v. O'Connell*, 322 F.3d 365 (5th Cir. 2003); *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001); *Maintenance Serv. v. Kenai Peninsula Bor.*, 850 P.2d 636 (Alaska 1993); *Starr v. Governor*, 154 N.H. 174, 910 A.2d 1247 (2006).

[16] See *State ex rel. Columbus Metal v. Aaron Ferer & Sons*, 272 Neb. 758, 725 N.W.2d 158 (2006).

[17] *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962).

[18] See *Myers v. Nebraska Invest. Council*, 272 Neb. 669, 724 N.W.2d 776 (2006).

[19] *Rath v. City of Sutton*, 267 Neb. 265, 673 N.W.2d 869 (2004).

[20] Brief for appellants at 29.

The State contends that despite the lack of qualitative standards in the free instruction clause, the Coalition is asking this court to determine that the plaintiff districts lack adequate funding to provide a quality education. The State argues that (1) this determination would require one district court to examine the adequacy of virtually every educational resource and program of the plaintiff districts and (2) thus, what constitutes adequate funding for education is inherently a political question that is not subject to judicial review.

The Coalition counters that this court, by ruling that the school funding system is unconstitutional, would not violate the separation of powers doctrine. It asks us to follow decisions from other state courts determining that the issue is justiciable. We conclude, however, that those decisions are not helpful either because the plaintiffs based their claims on equal protection or uniformity clauses in their state constitutions[21] or because their states' constitutional provisions are significantly different from ours.[22]

The Coalition contends that if we decide the Legislature is not fulfilling its duty, it would not require us to prescribe the proper means of financing schools. This is correct, but if we were to declare the present funding constitutionally inadequate, we would be passing judgment on the Legislature's spending priorities as reflected in its appropriation decisions. Thus, we believe the critical issue is whether, without violating the separation of powers clause, this court may determine that the Legislature has failed to provide adequate funding for public education.

---

[21] See, e.g., *Tennessee Small Schools Sys. v. McWherter*, 851 S.W.2d 139 (Tenn. 1993); *Brigham v. State*, 166 Vt. 246, 692 A.2d 384 (1997).

[22] See, e.g., *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002); *ISEEO v. State*, 132 Idaho 559, 976 P.2d 913 (1998); *Montoy v. State*, 275 Kan. 145, 62 P.3d 228 (2003); *Columbia Falls Elementary School v. State*, 326 Mont. 304, 109 P.3d 257 (2005); *Abbott v. Burke*, 119 N.J. 287, 575 A.2d 359 (1990); *DeRolph v. State*, 78 Ohio St. 3d 193, 677 N.E.2d 733 (1997); *Edgewood Indep. School Dist. v. Kirby*, 777 S.W.2d 391 (Tex. 1989); *Seattle School Dist. v. State*, 90 Wash. 2d 476, 585 P.2d 71 (1978); *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979).

## 2. Nebraska Case Law Under Free Instruction Clause

We have stated, "What methods and what means should be adopted in order to furnish free instruction to the children of the state has been left by the constitution to the legislature."[23] In *State ex rel. Shineman v. Board of Education*,[24] the parents of 5-year-old children sought a peremptory writ of mandamus to compel a school district to provide a kindergarten class. The parents claimed that 5-year-olds had a clear right to public education under the free instruction clause and two statutes enacted under its authority. One of the statutes required schools organized in cities of that class to be free to all children between 5 and 21 years of age. The other statute prohibited admission to first grade for children under 5 years of age unless they would turn 6 by a specified date or had completed kindergarten.

■ Because their children were ineligible for admission to first grade, the parents argued that their 5-year-olds were denied their right to a free education. We stated:

> The [free instruction clause] is clearly directed to the Legislature. . . . With reference to this provision we said in Affholder . . . that the method and means to be adopted in order to furnish free instruction to the children of the state have been left by the Constitution to the Legislature. Clearly, legislation is necessary to carry into effect the constitutional provision. It is not a self-executing provision. It follows that relators must find statutory authority to sustain their contention.[25]

In *State ex rel. Shineman*, the parents lacked the authority for a writ of mandamus because the statutes did not mandate that the school districts provide kindergartens. Moreover, another statute gave district school boards discretion to establish a school's grades.

The State argues that these cases show that the funding required to provide public education remains exclusive with the

---

[23] *Affholder v. State*, 51 Neb. 91, 93, 70 N.W. 544, 545 (1897).

[24] *State ex rel. Shineman v. Board of Education*, 152 Neb. 644, 42 N.W.2d 168 (1950).

[25] *Id.* at 647-48, 42 N.W.2d at 170.

Legislature. The Coalition counters that these cases are not controlling because neither case required us to determine whether the Legislature had fulfilled its constitutional responsibilities. However, in *State ex rel. Shineman*, we declined to hold that the free instruction clause provided 5-year-olds with a right to education apart from what the Legislature had statutorily provided.

### 3. GOULD V. ORR

Alternatively, the Coalition argues that in *Gould v. Orr*,[26] we implicitly concluded that inadequate school funding is a justiciable issue. The Coalition's argument regarding *Gould* is twofold. First, they contend that the *Gould* court's exercise of jurisdiction shows this court considered the school funding issue to be justiciable because justiciability raises subject matter jurisdiction. Second, the Coalition contends the *Gould* court indicated a claim of inadequate funding that adversely affected a school district would state a cause of action under the Nebraska Constitution.

We agree that the *Gould* court exercised jurisdiction. But, "there is a significant difference between determining whether a . . . court has 'jurisdiction of the subject matter' and determining whether a cause over which a court has subject matter jurisdiction is 'justiciable.'"[27] In *Baker v. Carr*,[28] the U.S. Supreme Court explained the distinction between "lack of federal jurisdiction" and "inappropriateness of the subject matter for judicial consideration":

> In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not "arise under" the Federal Constitution, laws or treaties

---

[26] *Gould v. Orr*, 244 Neb. 163, 506 N.W.2d 349 (1993).

[27] *Powell v. McCormack*, 395 U.S. 486, 512, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969), quoting *Baker, supra* note 17.

[28] *Baker, supra* note 17, 369 U.S. at 198.

. . . or is not a "case or controversy" . . . or the cause is not one described by any jurisdictional statute.

Unlike the standing doctrine of justiciability,[29] the political question doctrine is not entangled with subject matter jurisdiction.[30] Thus, by exercising jurisdiction in *Gould*, the court did not implicitly conclude that the claim was justiciable.

We also disagree with the Coalition's contention that the *Gould* court recognized a cause of action for inadequate school funding. Like the Coalition, the plaintiffs in *Gould* also argued that the "present statutory structure for funding public schools in Nebraska is unconstitutional and inadequate."[31] The district court granted summary judgment for the State. On appeal, the *Gould* majority concluded that the trial court committed plain error in failing to sustain the State's demurrer because the plaintiffs had not stated a cause of action:

> Appellants' petition clearly claims there is disparity in funding among school districts, but does not specifically allege any assertion that such disparity in funding is inadequate and results in inadequate schooling. While appellants' petition is replete with examples of disparity among the various school districts in Nebraska, they fail to allege in their petition how these disparities affect the quality of education the students are receiving. In other words, although appellants' petition alleges the system of funding is unequal, there is no demonstration that the education each student is receiving does not meet constitutional requirements.[32]

But the majority also determined that "there appeared no reasonable possibility that the defect could be remedied" and remanded the cause with directions for the district court to dismiss.[33]

Contrary to the Coalition's position, the *Gould* majority's conclusion that the plaintiffs could not amend their petition to

---

[29] See *Chambers v. Lautenbaugh*, 263 Neb. 920, 644 N.W.2d 540 (2002).

[30] See, *Powell, supra* note 27; *Baker, supra* note 17.

[31] See *Gould, supra* note 26, 244 Neb. at 164, 506 N.W.2d at 350.

[32] *Id.* at 168-69, 506 N.W.2d at 353.

[33] *Id.* at 169, 506 N.W.2d at 353.

state a cause of action indicates that it probably determined the claim presented a nonjusticiable issue. However, the majority did not state the reason for its holding. And unlike the plaintiffs in *Gould*, the Coalition argues that the religious freedom clause imposes a qualitative component on the Legislature's duty to provide free instruction. Thus, we do not interpret *Gould* to decide this issue in favor of either party.

Arguably, our decision in *State ex rel. Shineman* could be extended to apply to this case. However, *State ex rel. Shineman* was limited to the right of 5-year-olds to kindergarten, rather than a right to an adequate education that implicates the entire school funding system. Thus, we look for further guidance in the criteria relied on by the district court.

The district court relied upon the U.S. Supreme Court's tests in *Baker v. Carr*,[34] for determining whether an issue presents a nonjusticiable political question. Although we have implicitly recognized the political question doctrine,[35] we have not previously adopted the U.S. Supreme Court's justiciability tests under that doctrine, which we do now. We begin, however, with an overview of our separation of powers jurisprudence and an explanation of the political question doctrine.

### 4. THE POLITICAL QUESTION DOCTRINE

#### (a) Separation of Powers Doctrine in Nebraska

In Nebraska, the distribution of powers clause[36] prohibits one branch of government from exercising the duties of another branch.[37] The separation of powers principle "prevents us from hearing a matter the determination of which the Constitution entrusts to another coordinate department, or branch, of government."[38] And, "[t]his court does not sit as a

---

[34] *Baker, supra* note 17.

[35] See *State ex rel. Steinke v. Lautenbaugh*, 263 Neb. 652, 642 N.W.2d 132 (2002).

[36] Neb. Const. art. II, § 1.

[37] *State v. Divis*, 256 Neb. 328, 589 N.W.2d 537 (1999).

[38] *State ex rel. Spire v. Conway*, 238 Neb. 766, 773, 472 N.W.2d 403, 408 (1991).

superlegislature to review the wisdom of legislative acts."[39] That restraint reflects the reluctance of the judiciary to set policy in areas constitutionally reserved to the Legislature's plenary power.

### (b) The Political Question Doctrine

Determining that an issue presents a nonjusticiable political question is not an abdication of the judiciary's duty to construct and interpret the Nebraska Constitution.[40] The U.S. Supreme Court described the judiciary's duty in dealing with nonjusticiable political questions:

> Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.[41]

"It is emphatically the province and duty of the judicial department to say what the law is."[42] "Sometimes, however, the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights."[43]

All doctrines of justiciability—including standing, mootness, ripeness, and political question—are legal principles that arise out of prudential considerations of the proper role of the judiciary in democratic government.[44] The political question

---

[39] See, e.g., *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 943, 663 N.W.2d 43, 68 (2003). Accord *State v. Ruzicka*, 218 Neb. 594, 357 N.W.2d 457 (1984).

[40] See *DeCamp v. State*, 256 Neb. 892, 594 N.W.2d 571 (1999).

[41] *Baker, supra* note 17, 369 U.S. at 211.

[42] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803).

[43] *Vieth v. Jubelirer*, 541 U.S. 267, 277, 124 S. Ct. 1769, 158 L. Ed. 2d 546 (2004).

[44] See *Allen v. Wright*, 468 U.S. 737, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).

doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the legislative or executive branches of government.[45] The doctrine is "designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government."[46]

"When a court concludes that an issue presents a non-justiciable political question, it declines to address the merits of that issue [and] acknowledges the possibility that a constitutional provision may not be judicially enforceable."[47] In *Baker v. Carr*,[48] the U.S. Supreme Court set out the contours of the political question doctrine.

### 5. *BAKER* CRITERIA FOR DETERMINING WHETHER A POLITICAL QUESTION IS PRESENTED

In *Baker*, the Court determined that a claim of discriminatory apportionment of state representatives was justiciable under the Equal Protection Clause. Before *Baker*, the Court had held that a challenge to state action based on the Guaranty Clause,[49] under which the United States guarantees each state a republican form of government, presented a nonjusticiable political question.[50] To explain the difference in these outcomes, the Court first reviewed its political question jurisprudence in several areas. It then defined "six independent tests,"[51] for determining whether an issue was nonjusticiable:

Prominent on the surface of any case held to involve a political question is found [(1)] a textually demonstrable

---

[45] See *Japan Whaling Assn. v. American Cetacean Soc.*, 478 U.S. 221, 106 S. Ct. 2860, 92 L. Ed. 2d 166 (1986).

[46] *United States v. Munoz-Flores*, 495 U.S. 385, 394, 110 S. Ct. 1964, 109 L. Ed. 2d 384 (1990).

[47] *Department of Commerce v. Montana*, 503 U.S. 442, 457-58, 112 S. Ct. 1415, 118 L. Ed. 2d 87 (1992).

[48] *Baker, supra* note 17.

[49] U.S. Const. art. IV, § 4.

[50] See *Baker, supra* note 17.

[51] *Vieth, supra* note 43, 541 U.S. at 277 (discussing *Baker, supra* note 17).

constitutional commitment of the issue to a coordinate political department; or [(2)] a lack of judicially discoverable and manageable standards for resolving it; or [(3)] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [(4)] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [(5)] an unusual need for unquestioning adherence to a political decision already made; or [(6)] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of "political questions," not one of "political cases." The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing.[52]

As set forth, the tests are disjunctive: a court should not dismiss a case for nonjusticiability "[u]nless one of these formulations is inextricable from the case at bar."[53]

The *Baker* Court explained that claims under the Guaranty Clause were nonjusticiable because they embodied elements that defined a political question. Under the second test—lack of judicially discoverable and manageable standards—the Court could not resolve apportionment claims. It stated that "the Guaranty Clause is not a repository of judicially manageable standards which a court could utilize independently in order to identify a State's lawful government."[54] In contrast, the equal protection

---

[52] *Baker, supra* note 17, 369 U.S. at 217.

[53] *Id.*

[54] *Id.* at 223.

claim presented the issue of the consistency of state action and was justiciable. The Court left open the possibility, however, that some 14th Amendment claims would be nonjusticiable because they are too enmeshed with one of the political question tests.[55]

The Coalition, however, argues that the U.S. Supreme Court has rejected the *Baker* tests. But *Baker* is still alive. As recently as 2004, the Court applied the second test to determine that political gerrymandering claims regarding congressional redistricting plans presented nonjusticiable political questions.[56]

### 6. APPLICATION OF *BAKER* TESTS TO COALITION'S CLAIMS

#### (a) Textually Demonstrable Constitutional Commitment of Issue to Coordinate Political Department

As discussed, we have already determined that the free instruction "provision is clearly directed to the Legislature" and that the duty to adopt the method .and means to furnish free instruction has been left by the state Constitution to the Legislature.[57] The plain language of the religious freedom clause also textually commits to the Legislature the duty to encourage schools: "it shall be the *duty of the Legislature* to pass suitable laws . . . to encourage schools and the means of instruction."[58]

However, the U.S. Supreme Court has stated:

> [T]he concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving [the second test]; the lack of judicially manageable standards may strengthen the conclusion that there is a textual demonstrable commitment to a coordinate branch.[59]

---

[55] *Baker, supra* note 17.

[56] See *Vieth, supra* note 43.

[57] *State ex rel. Shineman, supra* note 24, 152 Neb. at 647, 42 N.W.2d at 170.

[58] Neb. Const. art. I, § 4. Compare, *Lake View Sch. Dist. No. 25, supra* note 22; *Seattle School Dist., supra* note 22.

[59] *Nixon v. United States*, 506 U.S. 224, 228, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993).

### (b) Lack of Judicially Discoverable and Manageable Standards for Resolving Issue

 The district court concluded that "[t]here is a lack of judicially discoverable or manageable standards for resolving the issue of whether the Nebraska school funding system satisfies the constitutional requirements of 'free instruction in common schools' or 'suitable laws.'" We agree that under the second *Baker* test, there are no qualitative, constitutional standards for public schools that this court could enforce, apart from the requirements that the education in public schools must be free and available to all children.[60] Nebraska's constitutional history shows that the people of Nebraska have repeatedly left school funding decisions to the Legislature's discretion. Even more illuminating, the people rejected a recent amendment that would have imposed qualitative standards on the Legislature's duty to provide public education.

### (i) Nebraska's Constitutional History Regarding Legislature's Duty to Provide Free Public Schools Shows Qualitative Standards Have Been Omitted

In Nebraska's first state Constitution, the framers rejected the "thorough and efficient" language that is found in many other state constitutions. In its cross-appeal, the State correctly points out that the education article in Nebraska's 1866 territorial constitution contained a more qualitative duty to secure a system of schools. It also referred to the means of financing schools: "The legislature shall make such provisions by taxation or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the state . . . ."[61] After Nebraska was admitted as a state, however, the 1875 constitution did not contain

---

[60] See, *Tagge v. Gulzow*, 132 Neb. 276, 271 N.W. 803 (1937); *State, ex rel. Baldwin v. Dorsey*, 108 Neb. 134, 187 N.W. 879 (1922); *Martins v. School District*, 101 Neb. 258, 162 N.W. 631 (1917).

[61] Nebraska Legislative Reference Bureau & Nebraska State Historical Society, bulletin No. 13, Nebraska Constitutions of 1866, 1871 & 1875, at 126, 128 (Addison E. Sheldon ed., 1920).

the "thorough and efficient" language or refer to any means of financing schools.[62]

Additionally, the framers rejected language that would have required uniformity between schools. Article VII, § 5, of the 1871 proposed state constitution would have included a uniformity clause: "The legislature shall provide by law for the establishment of district schools *which shall be as nearly uniform as practicable,* and such schools shall be free, and without charge for tuition, to all children between the ages of five and twenty-one years."[63] The 1871 constitution, however, was never adopted.[64] Although the constitutional debates from the 1875 convention have been lost,[65] there is no uniformity clause in the 1875 constitution.[66]

In 1972, the people explicitly left all funding of public schools to the Legislature's exclusive discretion. The 1875 constitution contained a separate section requiring "an equitable distribution of the income of the fund set [a]part for the support of the common schools, among the several school districts."[67] This provision, however, was omitted from the Nebraska Constitution as part of 1972 amendments "to recodify, revise, and clarify" article VII.[68] The Nebraska Constitution now provides that all funds "for the support and maintenance of the common schools" shall be used "as the Legislature shall provide."[69]

Finally, in 1996, voters rejected a constitutional amendment that would have imposed qualitative standards on the type of education the Legislature must provide. The amendment would have made a "'quality education' . . . a fundamental

---

[62] *Id.* at 125.

[63] *Id.* at 124 (emphasis supplied).

[64] *Id.* at 3.

[65] See *Jaksha v. State,* 222 Neb. 690, 385 N.W.2d 922 (1986).

[66] Nebraska Constitutions of 1866, 1871 & 1875, *supra* note 61.

[67] *Id.* at 127.

[68] See 1972 Neb. Laws, L.B. 1023.

[69] Neb. Const. art. VII, § 9.

constitutional right of each person" and a "'thorough and efficient education' . . . the 'paramount duty' of the state."

▆▆ This constitutional history shows that the framers of the 1875 constitution intentionally omitted any language from the free instruction clause that would have placed restrictions or qualitative standards on the Legislature's duties regarding education. Nor has the Coalition pointed to any history showing that the framers intended the State to make up for funding shortages in individual school districts. We interpret the paucity of standards in the free instruction clause as the framers' intent to commit the determination of adequate school funding solely to the Legislature's discretion, greater resources, and expertise.

### (ii) The Religious Freedom Clause Does Not Add Qualitative Standards to the Legislature's Duty to Provide Free Instruction

Contrary to the Coalition's argument, the Legislature's general duty under the religious freedom clause to pass suitable laws to encourage schools does not alter our conclusion that the Nebraska Constitution lacks enforceable standards. The Legislature in 1881 enacted a law establishing a system of public school districts.[70] But this enactment did not require the Legislature to allocate state revenues for the funding of the districts. Moreover, we have stated: "'A school district is a creation of the Legislature. Its purpose is to *fulfill* the constitutional duty placed upon the Legislature "to encourage schools and the means of instruction" and it is a governmental subdivision to which authority to levy taxes may properly be delegated under the Constitution.'"[71]

▆▆ Thus, we have not interpreted the religious freedom clause as imposing an affirmative duty on the Legislature to encourage schools beyond the establishment of school districts with authority to raise taxes. We do not question the importance of the Legislature's duty to encourage schools. But if we

---

[70] 1881 Neb. Laws, ch. 78, p. 331-87.

[71] *Banks v. Board of Education of Chase County*, 202 Neb. 717, 719-20, 277 N.W.2d 76, 79 (1979) (emphasis supplied), quoting *Campbell v. Area Vocational Technical School No. 2*, 183 Neb. 318, 159 N.W.2d 817 (1968).

interpreted that duty to mean that the Legislature must ensure the "quality" education the Coalition seeks, we would be ignoring the people's clear rejection of that standard in 1996.[72] Nor do we believe that the Legislature's authority to provide state aid to school districts is subject to the judiciary's intervention.

### (c) Impossibility of Deciding Issue Without Making Policy Determinations Clearly Requiring Nonjudicial Discretion

Any judicial standard effectively imposing constitutional requirements for education would be subjective and unreviewable policymaking by this court. As the Illinois Supreme Court stated:

It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution in any meaningful sense. Nor is education a subject within the judiciary's field of expertise . . . . Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion.

To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in Illinois. . . . In contrast, an open and robust public debate is the lifeblood of the political process in our system of representative democracy. Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the State and their elected representatives.[73]

We conclude that the relationship between school funding and educational quality requires a policy determination that is clearly for the legislative branch. Although an overall goal of state aid to schools is to reduce reliance on property tax,

---

[72] See *Pony Lake Sch. Dist. v. State Committee for Reorg.*, 271 Neb. 173, 710 N.W.2d 609 (2006).

[73] *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 28-29, 672 N.E.2d 1178, 1191, 220 Ill. Dec. 166, 179 (1996).

there are a multitude of policy decisions that go into state funding decisions, including consideration of federal mandates, the school district's local efforts and ability to support its schools, and the State's ability to provide funding.[74] In brief, it is beyond our ken to determine what is adequate funding for public schools. This court is simply not the proper forum for resolving broad and complicated policy decisions or balancing competing political interests.

#### (d) Impossibility of Resolving Issue Without Disregarding Legislature's Exclusive Authority

The fourth *Baker* test is the impossibility of a court's deciding an issue without expressing lack of the respect due coordinate branches of government.[75] The State correctly points out that we have stated: "'[T]he control of the purse strings of government is a legislative function.'"[76]

Fiscal policy issues are the very decisions that have been left to the Legislature by the Nebraska Constitution.[77] We could not hold that the Legislature's expenditures were inadequate without invading the legislative branch's exclusive realm of authority. In effect, we would be deciding what spending issues have priority. The Florida Supreme Court came to the same conclusion:

> "To decide such an abstract question of 'adequate' funding, the courts would necessarily be required to subjectively evaluate the Legislature's value judgments as to the spending priorities to be assigned to the state's many needs, education being one among them. In short, the Court would have to usurp and oversee the appropriations power, either directly or indirectly, in order to grant the relief sought by Plaintiffs. While Plaintiffs assert that they do not ask the

---

[74] See, § 79-1002, *supra* note 7; Floor Debate, L.B. 540, Committee on Education, 98th Leg., 1st Sess. (Apr. 24, 2003).

[75] See *Baker, supra* note 17.

[76] *State ex rel. Meyer v. State Board of Equalization & Assessment,* 185 Neb. 490, 498, 176 N.W.2d 920, 925 (1970), quoting *Colbert v. State,* 86 Miss. 769, 39 So. 65 (1905).

[77] See Neb. Const. art. III, § 25.

Court to compel the Legislature to appropriate any specific sum, but merely to declare that the present funding level is constitutionally inadequate, what they seek would nevertheless require the Court to pass upon those legislative value judgments which translate into appropriations decisions."[78]

### (e) Courts' Inability to Immediately Resolve School Funding Disputes

As noted, a justiciable issue must be susceptible to immediate resolution and capable of present judicial enforcement.[79] But courts have been unable to immediately resolve school funding disputes. For example, after a decade of litigating the constitutionality of the state's school funding system and despite legislative enactments in the interim, the Arkansas Supreme Court affirmed the trial court's determination that the system was inadequate. The court stayed its mandate, however, to give the legislature an opportunity to implement appropriate changes.[80] When the legislature did not comply, the court recalled its mandate and appointed a master three separate times, despite dissents that the court had no jurisdiction to recall its mandate to examine subsequent legislation or to give orders to the legislature.[81]

A similar history occurred in Kansas. The Kansas Supreme Court first reversed the trial court's dismissal of the case.[82] Two years later, it affirmed the trial court's judgment that the school funding system was constitutionally inadequate and required increased funding. The Kansas court also retained jurisdiction to allow the legislature time to correct the constitutional

---

[78] *Coalition for Adequacy v. Chiles*, 680 So. 2d 400, 406-07 (Fla. 1996).

[79] *Rath, supra* note 19.

[80] *Lake View Sch. Dist. No. 25, supra* note 22.

[81] *Lake View Sch. Dist. No. 25 v. Huckabee*, 364 Ark. 398, 220 S.W.3d 645 (2005); *Lake View School Dist. No. 25 v. Huckabee*, 362 Ark. 520, 210 S.W.3d 28 (2005); *Lake View School Dist. No. 25 v. Huckabee*, 355 Ark. 617, 142 S.W.3d 643 (2004).

[82] *Montoy, supra* note 22.

deficiencies.[83] Six months later, the court held that the new school financing scheme also failed to pass constitutional muster and ordered $285 million in additional appropriations for the next school year while the legislature made further corrections.[84] In 2006, the court finally dismissed the case after the state showed it had increased total funding to schools by an estimated $755.6 million.[85]

Other states have entertained continuous appeals and ordered appropriations from state legislatures as judicial remedies. For example, the Texas Supreme Court has addressed the constitutionality of the state's school funding system six times since 1989.[86] The Alabama Supreme Court, "after issuing four decisions in this case over the past nine years," conceded that "the pronouncement of a specific remedy 'from the bench' would necessarily represent an exercise of the power of that branch of government charged by the people of the State of Alabama with the sole duty to administer state funds to public schools: the Alabama Legislature."[87]

The New Jersey Supreme Court first struck down the state's funding system in 1973.[88] A generation later, the court had decided a string of cases on the issue and struck down three enactments as unconstitutional.[89]

In *Abbott by Abbott*,[90] the New Jersey Supreme Court ordered the state to increase funding to special needs districts by an

---

[83] See *Montoy v. State*, 278 Kan. 769, 102 P.3d 1160 (2005).

[84] *Montoy v. State*, 279 Kan. 817, 112 P.3d 923 (2005).

[85] *Montoy v. State*, 282 Kan. 9, 138 P.3d 755 (2006).

[86] See, *Neeley v. West Orange-Cove*, 176 S.W.3d 746 (Tex. 2005); *West Orange-Cove Consol. I.S.D. v. Alanis*, 107 S.W.3d 558 (Tex. 2003); *Edgewood Independent Sch. Dist. v. Meno*, 917 S.W.2d 717 (Tex. 1995); *Carrollton-Farmers v. Edgewood Independent*, 826 S.W.2d 489 (Tex. 1992); *Edgewood Indep. Sch. Dist. v. Kirby*, 804 S.W.2d 491 (Tex. 1991); *Edgewood Indep. School Dist., supra* note 22.

[87] *Ex parte James*, 836 So. 2d 813, 816-17 (Ala. 2002).

[88] See *Robinson, et al. v. Cahill, et al.*, 62 N.J. 473, 303 A.2d 273 (1973).

[89] See *Abbott by Abbott v. Burke*, 149 N.J. 145, 693 A.2d 417 (1997).

[90] *Id.*

amount that would equalize the average per-pupil expenditures in those districts with the average per-pupil expenditures in wealthier districts. The dissent noted that since 1990, the state had increased school funding to special needs districts by $850 million and estimated that the majority's ordered expenditures would amount to at least $248 million more.[91] Since 1997, the court has decided three additional appeals.[92] "The volume of litigation and the extent of judicial oversight provide a chilling example of the thickets that can entrap a court that takes on the duties of a Legislature."[93]

The landscape is littered with courts that have been bogged down in the legal quicksand of continuous litigation and challenges to their states' school funding systems. Unlike those courts, we refuse to wade into that Stygian swamp.

## VI. CONCLUSION

The Nebraska Constitution commits the issue of providing free instruction to the Legislature and fails to provide judicially discernible and manageable standards for determining what level of public education the Legislature must provide. This court could not make that determination without deciding matters of educational policy in disregard of the policy and fiscal choices that the Legislature has already made. Nor could we impose a constitutional standard of a "quality" education without ignoring the people's clear rejection of that standard in 1996. We conclude, as the district court did, that the claims therefore present nonjusticiable political questions.

AFFIRMED.

---

[91] *Id.* (Garibaldi, J., dissenting).

[92] *Abbott ex rel. Abbott v. Burke*, 177 N.J. 578, 832 A.2d 891 (2003); *Abbott ex rel. Abbott v. Burke*, 170 N.J. 537, 790 A.2d 842 (2002); *Abbott by Abbott v. Burke*, 153 N.J. 480, 710 A.2d 450 (1998).

[93] *City of Pawtucket v. Sundlun*, 662 A.2d 40, 59 (R.I. 1995) (discussing New Jersey cases).