REQUESTED BY: Senator Ken Haar
Nebraska State Legislature
Introduction
In a letter to this office you have asked for an Attorney General's opinion as to whether or not a proposed amendment to LB 235 would, if adopted, violate Neb. Const. art. VII, § 9.
The context of your request is as follows: LB 235, as introduced and as amended by the Education Committee (AM 681), would authorize the Board of Educational Lands and Funds to "issue leases for electricity generation utilizing solar or wind energy" on unsold school lands under its management; and it would also authorize the board to "enter into contracts for the sale of carbon offset credits" (which are also known as "carbon sequestration rights") in connection with the school lands. The proposed amendment to the bill (AM 700) would place the rental income from the leases and proceeds from the sale of the carbon offset credits into a newly-created Teacher Compensation Assistance Fund to be used "to increase the compensation paid to teachers in the State of Nebraska." Your question is whether or not the use of these funds for the purpose of increasing teacher compensation would violate Neb. Const. art. VII, § 9, which places limits on the use of income from unsold school lands.
Neb. Const. art. VII, § 9 and Historical Background
The specific provisions of Neb. Const. art. VII, § 9 that are at issue state:
 "(1) The following funds shall be exclusively used for the support and maintenance of the common schools in each school district in the state . . . as the Legislature shall provide: . . . (b) The income from the unsold school lands, except that costs of administration shall be deducted from the income before it is so applied."
Thus, the Nebraska Constitution makes clear that net income derived from unsold school lands is to be used only to support and maintain the common (or public) schools in each school district.
This constitutional limitation on the use of income from the unsold school lands is reflective of the history of Nebraska's organization as a state and admission into the Union. That history has been discussed in State ex rel. Ebke v. Board of Educational Lands and Funds of Nebraska,159 Neb. 79, 84-85, 65 N.W.2d 392, 396-97 (1954).
Nebraska came into the Union as a state by virtue of an Enabling Act of Congress approved April 19, 1864, 13 U.S.St. at Large, § 7, p. 49, which provided: `And be it further enacted, That sections numbered sixteen and thirty-six in every township, and when such sections have been sold or otherwise disposed of by any act of congress, other lands equivalent thereto, in legal subdivisions of not less than one quarter section, and as contiguous as may be, shall be, and are hereby, granted to said state for the support of common schools.'
A Constitution having been regularly approved within the territory in 1866, Nebraska was admitted into the Union on March 1, 1867. By its admission it assumed the privileges and duties of statehood, including those imposed by the congressional Enabling Act which included the acceptance of the lands and funds for the common schools of the state.
* * *
The provision of the Enabling Act making the grant, and of the Constitution of 1866 setting apart and pledging the principal and income from such grant, and the subsequent act admitting the state into the Union under such Constitution constituted a contract between the state and the national government relating to such grants. See State ex rel. Johnson v. Central Nebraska Public Power Irr. Dist., 143 Neb. 153,8 N.W.2d 841.
In Propst v. Board of Educational Lands Funds, 156 Neb. 226,55 N.W.2d 653, 657, this court said: `The school lands were received and are held in trust by the State of Nebraska for educational purposes. The state as trustee of the lands and of the income therefrom is required to administer the trust estate under the rules of law applicable to trustees acting in a fiduciary capacity.' The court also held: `The title to the state school lands was vested in the state upon an express trust for the support of common schools without right or power of the state to use, dispose of, or alienate the lands or any part thereof except as allowed by the Enabling Act and the Constitution.'
In short, as stated by the court in Ebke, by accepting these land grants from the United States made "for the support of the common schools" Nebraska obligated itself to use the income from these lands for that purpose only. Nebraska's Constitution reinforces this obligation. See, Neb. Const. art. VII, §§ 6 through 9.
Discussion
Ultimately, the question to be answered is whether or not increasing teacher pay through use of some narrowly specified income from the unsold school lands would be deemed to be providing support and maintenance to the public schools. If increasing teacher pay with these funds is seen as an action which "supports" and "maintains" the public schools, then using these funds in that way would not necessarily run afoul of the limitation in art. VII, § 9. The answer to this question turns on the meaning of the words "support" and "maintain" as used in the Constitution.
"The terms of a Constitution should be construed according to their plain and ordinary acceptation, unless it is evident they were used in a legal or technical sense." State ex rel. Tyrrell, Co. Atty. v. Lincoln Traction Co., 90 Neb. 535, 134 N.W. 278, 281 (1912). Accordingly, the words "support" and "maintenance" are to be given their plain and ordinary meaning.
Merriam-Webster Online Dictionary (http://www.merriam-webster.com/dictionary) offers several definitions for the word "support," three of which are useful in the context of art. VII, § 9. The first of these is "to promote the interests or cause of." The second is "to pay the costs of" as in "support a family." The last such possibly applicable definition of "support" is "to keep (something) going." "Maintenance" is defined in that same dictionary as "the act of maintaining." The applicable definitions of the word "maintain" are "to keep in an existing state (as of repair, efficiency, or validity)" and "to support or provide for" as in "has a family to maintain."
Given these definitions of "support" and "maintain," it appears to us that using the net income from wind and solar energy leases and the sale of carbon offset credits on the unsold school lands to increase the pay of public school teachers would not violate the provisions of art. VII, § 9. In reaching this conclusion we assume that the goal of such increased pay would be to improve the ability of the public schools to attract and retain talented and experienced teachers who might otherwise, for financial reasons, decide not to pursue or remain in a public teaching career. To that extent such use of the income contemplated in AM 700 would seem to "promote the interests or cause of" the public schools; and, in this manner, increased teacher pay would "support" the public schools and help "maintain" them as centers of capable and competent teaching. Moreover, since teacher compensation is, obviously, a large portion of any public school district's budget, using the specified income from the unsold school lands to provide increased teacher pay would also provide "support" and "maintenance" to the public schools in the financial and economic senses of those words.
Our conclusion that using the specified income from the unsold school lands to increase public school teacher compensation would not be unconstitutional is supported by the fact that art. VII, § 9 states that income arising from the perpetual school funds and from the unsold school lands is to be used for the support and maintenance of the common schools "as the Legislature shall provide." This quoted language indicates that the Legislature has at least some discretion to determine in what manner that income is to be used to effectuate the overall purpose of supporting and maintaining the public schools in Nebraska. Therefore, a legislative decision to direct some of that income to increased public school teacher compensation would be permissible so long as there is a reasonable basis to conclude that, in fact, such increased compensation will support and maintain — i.e., benefit — the public schools in each school district.
While not directly applicable here, it is, nonetheless, noteworthy that Neb. Const. art. VII, § 1 uses language similar to that found in art. VII, § 9 in stating: "The Legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years." (Emphasis supplied.) In discussing this language of art. VII, § 1 the Nebraska Supreme Court has said: "`What methods and what means should be adopted in order to furnish free instruction to the children of the state has been left by the constitution to the legislature.'" Nebraska Coalition for Educational Equity and Adequacy (Coalition) v. Heineman, 273 Neb. 531,542, 731 N.W.2d 164, 173 (2007) (quoting Affolder v. State, 51 Neb. 91,93, 70 N.W.544, 545 (1897)). In our view it is likely that the court would take a similar approach to art. VII, § 9 in leaving to the Legislature the determination of the methods and means for using the income from the perpetual school fund and from the unsold school lands to support and maintain the public schools.[1]
It is important to understand that, in this opinion, we are addressing only the somewhat abstract question of whether or not using income from wind and solar energy leases and from the sale of carbon offset credits on unsold school lands to increase public school teacher compensation would necessarily violate art. VII, § 9. Assuming that increasing teacher pay can reasonably be expected to result in an actual benefit to the public schools and the students in those schools, we have concluded that such use of these funds would not, in and of itself, result in a violation of that constitutional provision.
Additional Points
In light of the statement in your letter to this office that the fund proposed to be created under AM 700 would be "a holding fund, and no distribution method has yet been decided" and some concerns we have about the language contained in the proposed amendment itself, we offer the following additional comments.
First, if the Legislature wishes to use the income from the leases and sales described in LB 235 exclusively to increase the compensation of teachers, there should be some evidence in the legislative record from which it can be reasonably concluded that using the income for this particular purpose will, more likely than not, help to support and maintain the public schools. Having such a legislative record would assist in upholding the Legislature's decision as to such use of the income.
Second, any distribution method that is adopted should ensure that the income is used to support and maintain the "common schools in each school district in the state," as required by art. VII, § 9. To ensure this and avoid other possible constitutional problems, it would be best, in our view, to distribute the funds to the public school districts themselves for use to increase teacher compensation, rather than making payments directly to teachers from the fund.
Third, we note that proposed amendment AM 700, as presented to us, says that "[t]he [Teacher Compensation Assistance] fund shall be used to increase the compensation paid to teachers in the State of Nebraska." There is nothing in the proposed amendment limiting its scope to teachers in the public schools. Under art. VII, § 9, however, that income from the perpetual school funds and the unsold school lands may be used only to support and maintain "the common schools in each school district in the state." To the extent there are teachers in Nebraska who are employed by entities other than the public schools, no such income can be used to increase their compensation; and the newly-created fund cannot be used for that purpose. We suggest that AM 700 be amended to reflect that it is only the compensation of public school teachers which may be increased using these funds.
Finally, the proposed amendment states that "all rental income from leases" and "all proceeds from the sale of [carbon offset credits]" are to be credited to the Teacher Compensation Assistance Fund. (Emphasis supplied.) Art. VII, § 9(1)(b) makes it clear, however, that income from the unsold school lands is to have "the costs of administration" deducted before it is applied to the "support and maintenance of the common schools." Clarifying the proposed amendment to reflect this constitutional requirement that administrative costs be deducted would assist in avoiding confusion and possible conflict between what the Constitution requires and the language used by the Legislature.
Conclusion
It is our opinion that using the net income derived from wind and solar energy leases and the sale of carbon offset credits on unsold school lands to increase compensation paid to public school teachers in Nebraska would not, in and of itself, violate the provisions of Neb. Const. art. VII, § 9 limiting the use of income from the unsold school lands to the "support and maintenance of the common schools in each school district in the state." It is important, however, that any such use of this income be carefully structured so as to assure that it actually does provide "support and maintenance" to each school district and that it is directed only at the compensation of teachers in the public schools.
Sincerely,
 JON BRUNING Attorney General
 Charles E. Lowe Assistant Attorney General
Approved by:
 ___________________________ Attorney General
[1] In Propst v. Board of Educational Lands and Funds, 156 Neb. 226,233, 55 N.W.2d 653, 657 (1952), the supreme court stated that "[t]he school lands were received and are held in trust by the State of Nebraska for educational purposes." This use of the term "educational purposes" as synonymous with the constitutional language "support of the common schools" in describing the reason the school lands were granted to the state by the federal government also suggests that the term "support and maintenance of the common schools" in art. VII, § 9 would not be given an overly-narrow interpretation by the court were the issue to arise.